# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-11-00450-CR

**Dennis Davis, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. D-1-DC-09-900185, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING**

## O P I N I O N

A jury convicted Dennis Davis in 2011 of murdering Natalie Antonetti back in 1985, and the trial court sentenced him to 36 years' imprisonment. *See* Tex. Penal Code §19.02(b)(1), (2).[1] Among other grounds on appeal, Davis argues that the evidence was insufficient to support his conviction and that his trial counsel rendered ineffective assistance on a number of fronts, including failure to present at trial evidence that Antonetti's neighbor identified a potential alternate-perpetrator of the murder whom he had seen looking into windows of Antonetti's apartment building while holding what looked to be a club or small bat on the morning of her assault. Because we conclude that Davis has established that his counsel's performance fell below an objective standard of reasonableness and prejudiced his defense, we will reverse the trial court's judgment and remand this cause for a new trial.

---

[1] The relevant subsection of the penal code has been renumbered but remains the same substantively. *See* Act of May 23, 1973, 63d Leg., R.S., ch. 399, 1973 Tex. Gen. Laws 883, 913 *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, sec. 19.02(b), 1993 Tex. Gen. Laws 3586, 3613. We cite to the current version of the code for convenience.

## BACKGROUND

Natalie Antonetti was assaulted in her Austin apartment in the early morning hours of Sunday, October 13, 1985. There was no sign of forced entry, and nothing was stolen. Antonetti was not sexually assaulted and had no defensive wounds. The blunt force trauma to her head, which the medical examiner found consistent with having been attacked with a club or small bat, caused skull fractures, brain contusions, and a coma from which Antonetti never recovered. Antonetti died after the withdrawal of life support. The crime remained unsolved after the death of Austin Police Department Sergeant Edward Balagia, a homicide detective who served as lead investigator and conducted most of the interviews and evidence collection.

The unsolved "cold case" was reopened in 2007 after a call to a homicide tip line from Rebecca Davis, the wife of appellant Dennis Davis.[2] Rebecca told police that in 1991 after a few drinks, Davis cried and said he had "sinned against God and man," which she suspected was a reference to the unsolved murder of Davis's former girlfriend, Antonetti.

Davis was charged with Antonetti's murder. Davis's wife Rebecca recanted her story and argued unsuccessfully that Davis's statement to her was shielded by marital privilege. At trial, there was no physical or forensic proof connecting Davis to the crime; rather, his prosecution hinged on circumstantial evidence and testimony from witnesses, many of whom had not been contacted during the investigation back in the 1980s. The circumstantial evidence about Davis included Davis's relationship and last interaction with Antonetti, his arrival at the scene after the assault, his statements after the assault, his alibi, his ownership of a car similar to one seen in the parking lot of the apartments on the morning of the assault, and other acts of aggression in

---

[2] We refer to appellant's wife by her first name and to appellant by his last name.

2

the years since Antonetti's assault. The jury also considered certain statements and a 911 call from Donn Chelli, Antonetti's neighbor at the time of the assault.

## ANALYSIS

We begin by reviewing the sufficiency of the evidence supporting Davis's conviction, the appellate ground potentially affording him an acquittal, the greatest possible relief. *See Roberson v. State*, 810 S.W.2d 224, 225 (Tex. Crim. App. 1991) (appellate court should not have determined defendant's ineffective assistance of counsel issue without first reviewing sufficiency of evidence on defendant's convictions).

### Sufficiency of evidence

Davis contends that the evidence at trial was legally insufficient to support the jury's finding that he was the perpetrator of Antonetti's murder. Murder requires proof that a person intentionally or knowingly caused the death of another person, or intended to cause serious bodily injury, and committed an act clearly dangerous to human life that caused the death of another. Tex. Penal Code § 19.02(b)(1),(2).

We review the sufficiency of the evidence as to Davis's murder conviction under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), considering all the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *See id*. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt, and an actor's guilt can be established with circumstantial evidence alone. *Temple*, 390 S.W.3d at 359. In circumstantial-evidence cases, every fact need not point directly and independently to the guilt of the appellant; it is enough if the conclusion is warranted

3

by the combined and cumulative force of all the incriminating circumstances. *Id.* The jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict and defer to that determination. *Temple*, 390 S.W.3d at 360 (citing *Jackson*, 443 U.S. at 326). With these standards in mind, we summarize the evidence presented at trial.

### *Testimony of Davis's wife and ex-girlfriend*

Davis's wife Rebecca testified that early in their relationship, she asked Davis to tell her about his girlfriend who died. According to Rebecca, Davis told her that Antonetti had been too trusting, never locked her doors, and that one night somebody broke into her apartment and hit her on the head, causing her to eventually die. Davis suspected someone at Antonetti's apartment complex had done it.

Defense counsel questioned Rebecca about part of a statement she gave to police after the investigation was reopened in which she mentioned Davis swinging an ax in the backyard. Rebecca stated that in 2005, Davis had been using an ax while building a fence for their dogs and had been drinking too much. He got into an argument with her and began swinging the ax around. He yelled because the dogs had escaped and because Rebecca had not ensured that the dirt delivered for the fence was put in the right place. Rebecca testified that she "became really afraid of [Davis]." She said that although Davis was not swinging the ax at her, she "felt like it was aimed at [her]."

Rebecca denied ever hearing Davis confess to Antonetti's murder and denied that he owned a bat. She testified that she thought she was calling the police tip line anonymously, and she made the report to clear her conscience, not to turn Davis in. She also said she made the report when

4

they were having marital problems because she was "extremely mad" at Davis. Rebecca's Buddhist mentor and therapist advised her to unburden her soul of guilt by telling someone what she thought Davis's statement meant. Rebecca testified that she did not know what Davis meant when he said that he had "sinned against God and man," and when she asked him about it, he would not answer.

Rebecca's suspicion about the meaning of Davis's statement had some support at trial from Gelinda Mudgett, who had been Davis's girlfriend from 1987-89. Mudgett testified that once in 1988, after returning home from going out, Davis curled up into a ball on the front porch crying and said, "I didn't mean to do it," "I didn't mean to her hurt her," and "I didn't mean to kill Natalie." Mudgett asked why he did it, and Davis said it was because Antonetti was pregnant with his baby.[3] However, in pretrial conversations with police, Mudgett also stated that she could not recall what Davis told her and was not really sure what he said.

Mudgett further testified repeatedly, without objection, that Davis had been physically abusive to her during their relationship—once leaving her unconscious and another time placing a gun to her head while she slept—and because of his abuse she was afraid to report his confession. Mudgett acknowledged that she had loved Davis and continued to live with him after he confessed to her. Mudgett also testified that before his confession, Davis told her Antonetti had been beaten with a bat. She said Davis owned a small baseball bat but did not play baseball.

Other witnesses' opinions about Mudgett's truthfulness were mixed. Three of Davis's friends and former roommates, John Reed, James Rose, and Ray Steward, each testified that Mudgett did not have a reputation for truthfulness. The investigating officer who took Mudgett's statement, Detective Tom Walsh, testified that Mudgett told him that Davis was in a three-day rage

---

[3] The medical examiner who conducted Antonetti's autopsy testified that Antonetti was not pregnant.

and having a breakdown when he confessed the murder to her. Walsh said Mudgett's convictions about what she heard seemed stronger during his first conversation with her, but she called back a few days later saying she "kind of" remembered the conversation with Davis but could not remember what he said word for word. Walsh acknowledged it was odd for a person to wait 17 years to report an unsolved murder, and he wondered why it had taken her so long to make her statement.

Mudgett's testimony received some support from Linda Bless, a mutual friend of Mudgett and Davis, who recalled being at a party in 1987 at Davis's house and seeing Davis leave a bedroom with a bat in his hand. During cross examination, defense counsel asked whether Bless had ever seen Davis "do anything violent" to Mudgett, and Bless said she had not. She agreed that Mudgett and Davis had a "tumultuous relationship" and that Mudgett was not always truthful about certain things. On redirect, the State elicited further testimony about the bat incident from Bless, who said she saw Davis come out of a bedroom looking agitated, holding a bat, and seeming to threaten Mudgett with it. Bless asked Davis what he was doing, told him to "straighten up," and calmed him down by taking him outside to talk.

### *Davis's interactions with Antonetti*

The jury also heard from Davis's friend, Mark Thomas Lewis, Jr., who testified that he saw Antonetti at a Sixth Street club called Steamboat Springs sometime between 11:00 p.m. and 12:00 a.m. on the Saturday night before she was assaulted in the early morning hours on Sunday. He did not recall seeing Davis there. Lewis said Antonetti left Steamboat near closing time at 2:00 a.m., along with Lewis and his friend, John Hallman. The three walked to a corner where they parted ways, and Lewis testified that Antonetti seemed fine.

Davis's close friend James Rose told the jury that he had seen Davis with Antonetti at Steamboat arguing about Antonetti talking to another man. Rose testified that he was uncertain

6

whether the argument at Steamboat happened on the Friday or Saturday night before Antonetti's assault, but he acknowledged that in his statement to police, he said he witnessed the argument at 1:00 a.m. on Saturday, within a few hours of the assault. Rose also testified that a year and a half after the assault, while he was living with Davis and Mudgett, he found a small souvenir bat among some of Davis's things beneath a bed.

Susan Otten, Antonetti's roommate, also testified to seeing a bat at Davis's house after the assault. In 1985, Otten shared a two-story apartment at 1200 Barton Hills Drive with Antonetti and Antonetti's son, Johnny Goudie, who was Otten's boyfriend. Otten was also Davis's friend and worked for him at Studio D, his recording studio. Otten testified that she was home on October 13 around 2:30 a.m. when Antonetti returned from Steamboat and a club called Toulouse. Antonetti changed clothes and told Otten she was going for a walk by the pool. Otten was watching television in the living room when Antonetti came back about ten minutes later. Antonetti dozed on the couch, and Otten watched televison for a few more minutes before going to bed upstairs. When Otten got a glass of water from the kitchen about 4:30 a.m., she noticed Antonetti still asleep in the living room. About an hour later, Otten woke to the sounds of thumping, a door shutting, and moaning from downstairs. She went to the living room where she discovered Antonetti badly beaten and unable to speak. Otten called 911, then called Davis, and woke Antonetti's son, Johnny.

Johnny told the jury that he knew Davis as a man his mother dated and that he had visited Davis's Studio D, located about a mile from Antonetti's apartment. He testified that after his mother's assault and while waiting outside for EMS, he talked to an unknown neighbor who had seen someone walking around with a bat. Johnny saw Davis arrive at the apartment complex after EMS responded. He and Davis stood in the walkway outside the apartment, and Davis tried to stop

7

Johnny from going back inside. Johnny could not recall whether Davis entered the crime scene or had any contact with Antonetti between the time he arrived and when the ambulance left.

### *Davis's statements to police*

The jury read Davis's 1985 account of events in his sworn statement, provided to police on the day after Antonetti's assault. In the statement, Davis wrote that he dated Antonetti on and off for nine months but they recently became "just friends." He last saw Antonetti before going to work in the afternoon on Saturday October 12, and she seemed fine. He spent Saturday night at his house with another woman, Amparo Garcia, who fell asleep on the floor while they watched television. Davis watched movies and woke Garcia about 5:00 a.m. so they could go to bed. He thought he had been in bed just a couple of minutes when Otten called him at 5:30 a.m. or 6:00 a.m., hysterical and screaming, and asked him to come right over because "there was blood everywhere and something was wrong with Natalie." Twenty minutes later, he was at Antonetti's apartment, where EMS and police had already arrived. Davis looked in the door of the apartment and saw Antonetti lying on a stretcher while EMS bandaged her head. Davis said Antonetti's son Johnny told him not to go in because Antonetti would not want Davis to see her that way. Davis said that EMS brought Antonetti past him as they put her into the ambulance. He talked to officers at the scene and then took Otten to the hospital. The next day, he called police and offered to tell them what he knew.

The jury saw videotaped excerpts from Davis's 2008 police interview in which he said he had last seen Antonetti on the evening of Friday, October 11, 1985. Davis denied owning a small bat, denied committing the murder, and did not remember saying to anyone that he had "sinned against God and man." Davis said he knew the number of times Antonetti had been hit because Otten told him about the sounds she heard on the morning of the assault. He

8

acknowledged writing a "harsh" note to Antonetti and leaving it at her apartment door sometime before the assault, possibly the day before Antonetti died. His note, which was admitted into evidence, said, "Natalie–You can go to hell + take Doug with you . . . If you don't have the brains + the self respect to see thru his bullshit then 'f [---] you' D.D." Davis said he must have written the note after seeing a man named Doug Robb walking with Antonetti, which made Davis feel jealous. But Davis stated he "got over it" quickly because he was in love with Garcia and was trying to get away from Antonetti, who he said had become "real grabby" and had begun yelling at him for not giving her enough attention. Davis admitted that "in the eyes of other people," when he was younger, he sometimes went "into a rage."

### *Davis's alibi*

During the initial investigation and in his 1985 statement, Davis asserted that he had been at his house with Amparo Garcia on the night before and morning of Antonetti's assault. At trial, Amparo Garcia cast doubt on Davis's alibi.[4] She testified that she had kept a journal for many years, and based on her 1985 entries, she was "boarded up" with another man on the weekend of Antonetti's assault. She admitted that although there were no entries showing what she did on the night of October 12, 1985 or the morning of October 13, 1985, she said her journal would have reflected whether she spent the night with Davis. She said that her journal chronicled emotional events with Davis, and if she had spent the night at a boyfriend's house and he had left in the early hours of the morning without explanation, or headed to the scene of an assault, it would have been emotional to her. Garcia learned about the assault two days after it happened, as noted in her journal entry for October 15. She testified that Davis called her and said the police thought someone

---

[4] Garcia's name changed to "Amparo Garcia-Crow" by the time of trial.

followed Antonetti home from Sixth Street—maybe somebody she knew because there was no forced entry—and maybe hit her on the head with a baseball bat.

### *Davis's ownership of car similar to one parked at crime scene*

Dale Hopkins testified about trading a blue, late '70s Chevrolet Malibu to Davis in mid-1985 in exchange for some recording-studio time for his band, Stryken. Hopkins recalled that Davis's car was repossessed while Stryken was recording an EP record at Studio D, and Davis approached the band members stating that he needed a car. Hopkins did not know when Davis transferred the car's title to his name.

Terri Hurt, who lived in Antonetti's apartment complex, testified about seeing a "beat up" gray Chevy Malibu at 4:00 a.m. on the morning of the assault. Hurt was walking to a nearby convenience store after working a late-shift when she noticed the Malibu, with two people inside, parked oddly across a couple of spaces. She reported her sighting to the police after the assault because she remembered that the car was parked in front of Antonetti's building. At trial, Hurt acknowledged that she was relying on her statement to police from the 1980s because she could not remember which of the apartment parking lots was the one where she had seen the Malibu.

### *Donn Chelli's statements*

The jury also considered a 911 recording of a report from Donn Chelli, Antonetti's neighbor, who called minutes after Otten's 911 call and while unaware of the assault. In the recording, Chelli said that as he was walking back to his apartment from a nearby 7-11 store that morning, he saw a 28- to 30-year-old man looking into Chelli's apartment window. The man was wearing a t-shirt with the name of a local band called "The Lotions" and carrying a club or small bat. Detective Walsh testified that Chelli's description of the man he saw—as stocky, big-bellied,

10

about 5 feet 10, weighing between 200 and 220 pounds, with straight, light-blondish, medium-length hair—did not fit Davis's physical description, now or back then. Walsh also testified that a composite drawing was made during the initial investigation based on Chelli's description of the man he saw, but the drawing was lost.

Defense counsel read to the jury Chelli's 1985 sworn police statement, containing more details about the man Chelli had seen and events that occurred on the morning of the assault. Chelli recalled that as he was walking back from the store between 4:30 a.m. and 4:45 a.m. on Sunday, October 13, 1985, he noticed a man carrying a small, wooden baseball bat and looking into the living room window of Chelli's apartment. Chelli said the man "appeared to be in some kind of rage," and although "he was calm, he appeared to have a lot of built-up tension inside of him." After Chelli saw him, the man said something like, "You are the second person that has gotten into my shit." When Chelli asked the man what he was doing, the man said he was looking at cats on the balcony. Both men walked toward the parking lot until Chelli turned right to enter his apartment and the man continued walking straight toward the clubhouse.

Chelli put away the milk he had bought and walked back outside where he had seen the man heading, but did not see him again. Chelli returned to his apartment, had some cereal, and planned to tell his girlfriend what he had seen. He also decided to report the suspicious man to police. When Chelli called, the dispatcher asked if his call was about the same incident that had just been reported. Chelli responded that he did not know, and the dispatcher told him that someone had been beaten at the apartment complex and that an officer would come to talk to Chelli. Chelli and his girlfriend went outside their apartment and saw Johnny Goudie, who said that his mother was beaten and bleeding and that he was looking for the ambulance. Shortly afterward, EMS arrived. Chelli and his girlfriend then walked to the parking lot where they met with police.

11

Chelli did not appear at trial. Defense counsel read the jury a stipulation, also admitted into evidence, about Chelli's reluctance to testify. It stated that if Chelli had testified, the State would have elicited from him that: (1) the State and defense spoke with Chelli several times and requested that he testify at trial, but Chelli refused; (2) Chelli concealed his physical address from the State and defense investigators, making it impossible to subpoena him; and (3) during two telephone conversations with "officers of this court," Chelli changed his written statement by claiming that the man he saw wearing the Lotions t-shirt was 6 feet 3 inches tall, that Chelli never had any discussion with the "Lotions man," and that Chelli never saw or spoke with Johnny Goudie or Susan Otten on the morning of the assault.

The State challenged Chelli's reliability and argued to the jury that the man Chelli had seen was Davis, despite the seemingly different physical description. The State elicited testimony from Austin Police Officer Kenneth Cannaday, who stated that the month after Antonetti's assault, Chelli called to report seeing someone he had seen before in the area of the crime. Cannady testified that police searched for and eventually located the man Chelli saw on that later occasion, who was named Gerald Kruz. Unlike Chelli's description of the "Lotions man," Kruz was 5 feet 8 inches tall, about 180 pounds, and had black hair and green eyes. Cannaday arrested Kruz for public intoxication, booked him into jail, and placed a "hold" on him for homicide. Later, Sergeant Balagia interviewed and eliminated Kruz as a suspect in Antonetti's murder.

The State made further effort to explain away the discrepancies in the physical description of the man Chelli saw on the morning of the assault and Davis by calling Charles A. Weaver III, a professor of psychology and neuroscience at Baylor University. This human memory and eyewitness identification expert discussed a concept called "weapon focus" as part of the prosecution's effort to explain why Chelli must have been mistaken in his description of the person

12

he saw. He testified that in situations of extreme emotion and when people feel threatened, their attention tends to be drawn to the weapon and they can usually give a very good description of it, at the expense of the event's other details. Weaver testified that weapon focus may cause a witness's memory about a person's physical features such as height and weight to be less reliable than a description of a weapon and the description of a familiar name on a t-shirt, viewed as someone was walking away and when there was no threat.

During closing, the State argued that Davis was the person Chelli saw on the morning of Antonetti's assault (despite the discrepancies in the physical description), that the crime scene suggested a crime of passion, and that everything pointed to Davis as the perpetrator. Davis argued that the evidence against him was circumstantial, left room for reasonable doubt about his guilt, and was insufficient to convict him. After five days of trial, the jury recessed to deliberate at 11:38 a.m., then returned to court with their verdict at 3:46 p.m., finding Davis guilty.

On appeal, Davis argues that there was insufficient physical evidence and testimony at trial for the jury to have found beyond a reasonable doubt that he committed this crime. He notes that he does not match Chelli's description of the man seen holding a club or small bat outside Antonetti's apartment, there is no DNA or fingerprint evidence linking him to the assault or the crime scene, and no one observed any blood on him when he arrived after the assault. Davis also notes that multiple witnesses testified Mudgett was not a truthful person, and Lewis testified that he saw Antonetti at Steamboat without Davis on the night before the assault and that she seemed fine when she left.

After considering all the evidence presented at trial in the light most favorable to the jury's verdict, we conclude there is sufficient evidence to support Davis's conviction. The jury heard evidence that Davis argued with Antonetti at Steamboat just hours before her assault. He gave an

13

alibi that could not be confirmed. A car generally matching the description of one Davis owned was seen in the parking lot outside Antonetti's building the morning of the assault. Chelli, who was Antonetti's neighbor, reported seeing a man with a club or small bat looking into Chelli's apartment window, and the State argued that Davis was the man Chelli had seen. When he arrived at the crime scene, Davis looked in but remained outside the apartment. He knew the number of times Antonetti's head had been hit. He knew Antonetti did not lock her doors. He was alleged to have a small bat although he denied owning one. He admitted being jealous of seeing Antonetti with another man and leaving a harsh note on her doorstep, possibly the day before she died. He claimed he loved Garcia and was trying to get away from Antonetti. Davis could not recall stating that he had "sinned against God and man," but his wife did, and his statement troubled her so much that she felt compelled to report it to police. Davis admitted that he would sometimes "go into a rage." The jury heard testimony that when he was angry, he once swung an ax in a way that made his wife think it was aimed at her, and that on another occasion, he took hold of a bat as an apparent threat to his girlfriend. There was testimony that he beat his girlfriend, once leaving her unconscious and another time putting a gun to her head while she slept. And he allegedly confessed to his girlfriend that he killed Antonetti.

The jury was entrusted with assessing the credibility and demeanor of the witnesses. *See Temple*, 390 S.W.3d at 363. The testimony and circumstantial evidence presented at trial and reasonable inferences therefrom, considered in the light most favorable to the verdict, show that the jury was rationally justified in finding Davis's guilt beyond a reasonable doubt. *See id.* at 360. The jury's determination was warranted by the combined and cumulative force of all the incriminating circumstances in this record and was not "so outrageous that no rational trier of fact could agree." *Id.* at 359, 363 (quoting *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012)). To the extent

14

that this record supports conflicting inferences, we must presume the jury resolved conflicts in favor of the verdict and defer to that determination. *See id.* at 360 (citing *Jackson*, 443 U.S. at 326). Accordingly, we overrule Davis's challenge to the legal sufficiency of the evidence supporting his conviction.

**Ineffective assistance of counsel and the *Strickland* standard**

Davis further contends on appeal that defense counsel rendered ineffective assistance, in part by failing to complete his presentation of a third-party-perpetrator theory and accompanying evidence involving Antonetti's neighbor, Chelli, and his identification of a different man from a photographic lineup as the person he had seen holding a club or small bat while looking into Chelli's apartment on the morning of Antonetti's assault. Based on the record before us, we agree.

An ineffective assistance of counsel claim is subject to the *Strickland* standard, requiring a defendant to prove by a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). Ineffective-assistance claims turn on the facts and circumstances of each particular case, *Johnson v. State*, 691 S.W.2d 619, 626 (Tex. Crim. App. 1984), and must be firmly founded in the record. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). An accused is not entitled to entirely errorless representation, and we look to the totality of the representation in gauging the adequacy of counsel's performance. *Frangias v. State*, 392 S.W.3d 642, 653 (Tex. Crim. App. 2013). But even a single instance of counsel's error can rise to the level of deficient performance, "if the error was egregious and had a seriously deleterious impact on the balance of the representation." *Id*. A verdict or conclusion only weakly

15

supported by the record is more likely to have been affected by errors than one with overwhelming record support. *Strickland*, 466 U.S. 696.

In applying the first prong of the *Strickland* standard, we must determine whether the defendant proved by a preponderance of the evidence that there is no plausible, professional reason for a specific act or omission. *Bone*, 77 S.W.3d at 836. We indulge a strong presumption that counsel's action fell within the wide range of reasonable and professional assistance. *Salinas*, 163 S.W.3d at 740. However, appellant may rebut that presumption by showing that his counsel's representation was unreasonable under prevailing professional norms and the challenged action was not sound trial strategy. *Tapia v. State*, 933 S.W.2d 631, 634 (Tex. App.—Dallas 1996, pet. ref'd). Further, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for [his actions]." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).

In applying the second prong of the *Strickland* standard, we must determine whether there is a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's deficiency, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

### *Evidence of ineffective assistance in motion for new trial*

This case presents a challenge on appeal because the most direct evidence of counsel's ineffective assistance is attached to Davis's motion for new trial, which the trial court ruled on without holding a hearing. The motion included as attachments actual police documentation of witness statements not put forth at trial, along with a sworn declaration from defense counsel evidencing his error in believing the trial judge had excluded evidence of a third-party perpetrator

16

and explaining his trial strategies (or lack thereof) in not bringing this evidence at trial. The police documents provide details about the identification made by Chelli, Antonetti's neighbor, of a different individual—not Davis—as the man Chelli saw looking into his living room window while holding a club or small bat on the morning of Antonetti's assault. In the absence of this evidence, the State argued at trial that Davis was the man Chelli had seen lurking near Antonetti's apartment building and looking into Chelli's apartment window, that Chelli was mistaken to the extent the physical description he gave did not match Davis, and even called a witness to espouse a "weapon focus" theory that would explain to the jury why Chelli's description of the lurker could have been distorted.

On appeal, the State asserts that counsel's "affidavit" and accompanying evidence is not before this Court and cannot form the basis for appellate relief on the ineffective assistance claim because no hearing was held on the motion for new trial and it is unclear "what [Davis] actually introduced, if anything, into the record on the motion for new trial." The State relies on a line of cases including the Texas Court of Criminal Appeals's recent holding in *Rouse v. State*, 300 S.W.3d 754, 762 (Tex. Crim. App. 2009), for its argument that where such evidence is not formally admitted at a hearing on a motion for new trial, it is not properly in the record for consideration on appeal. In *Rouse*, the court of criminal appeals held that the court of appeals erred in relying on unsworn allegations set forth in an analogous post-trial pleading, noting that "post trial motions such as these are not self-proving and any allegations made in support of them by way of affidavit or otherwise must be offered into evidence at a hearing." *Id*.

Read broadly, *Rouse* supports the State's assertion that the evidence put forth by Davis's counsel in his motion for new trial, because it was not formally admitted at a hearing, is not

17

before us on appeal.[5] There are, however, several noteworthy differences between this case and the circumstances presented in *Rouse* that raise questions on the extent to which *Rouse* controls here. First, in *Rouse* the post-trial motion was overruled by operation of law with no indication on the record that a hearing was requested. *Id*. at 760. As the *Rouse* court framed the issue, "no fact finder has evaluated th[e] statement." *Id*. at 761. Here, in contrast, Davis requested a hearing on his motion for new trial, but the trial court ruled on the motion and issued findings without holding a hearing.[6] The situation with Davis's motion for new trial—which was considered, ruled on, and the subject of findings by the trial court—differs from the motion at issue in *Rouse*, which was overruled by operation of law with no hearing requested and "no fact finder" having evaluated the statement. *Id*. at 760, 761. Second, the *Rouse* holding is based in part on a concern that the State, as nonmoving party, did not have an opportunity to respond to the allegations supporting Rouse's motion before it was overruled by operation of law. *Id*. at 762. Here, the trial court's order specifies that "[t]he parties were given an opportunity to file responses and affidavits" before the trial court considered and denied Davis's motion for new trial. Third, we note that the *Rouse* court was concerned with an attorney's unsworn allegations in a pleading, which was not self-proving. *Id*. at 758, 761, 762. Here, Davis's motion relies not only on his attorney's declaration, which is sworn but not

---

[5] We acknowledge that the general proposition in *Rouse* that affidavits and attachments in support of motions for new trial must be offered into evidence at a hearing is supported in a number of cases with substantive issues and procedural postures different from the present case. *See, e.g.*, *McIntire v. State*, 698 S.W.2d 652, 657 (Tex. Crim. App. 1985) (issue on appeal was whether defendant was entitled to hearing on his motion for new trial); *Skaggs v. State*, 18 S.W.3d 277, 281 (Tex. App.—Austin 2000, pet. ref'd) (appellant complained on appeal of trial court's failure to hold hearing on motion for new trial); *Jackson v. State*, 139 S.W.3d 7, 20 (Tex. App.—Fort Worth 2004, pet. ref'd) (trial court held hearing on motion for new trial but defendant did not offer affidavit into evidence).

[6] Davis does not complain on appeal of the trial court's ruling on his motion for new trial without a hearing.

attested by a notary, but also on attachments to the motion, including documentation from the Austin Police Department's case file. As such, the evidence at issue here differs in nature from that presented in *Rouse*.

Based on the differences noted above, both procedurally and substantively, it is not entirely clear that *Rouse* precludes our consideration of the exhibits attached to Davis's motion for new trial. As such, we will bifurcate our analysis of Davis's claim of ineffective assistance, looking first at the record including the motion for new trial and its attachments, and then separately analyzing Davis's claims of ineffective assistance based solely on the record without those materials.

To the extent that defense counsel's declaration and the other exhibits attached to Davis's motion for new trial are before us on appeal, we conclude that this record supports Davis's contention that his counsel's performance fell below an objective standard of reasonableness and such deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 687-88, 694. The record contains sufficient evidence that Davis's counsel erred in interpreting the law on the required nexus for admission of third-party perpetrator evidence, misunderstood the trial court's ruling on the admissibility of same, and failed to put into the record the available evidence linking the specific potential third-party perpetrator identified by Chelli and the crime. Counsel's affidavit shows that this deficiency and counsel's other failures at trial, discussed more fully below, were not the result of any reasonable trial strategy. Additionally, the Austin Police Department documents submitted with the motion for new trial raise the reasonable probability that the jury would have come to a different verdict, detailing that Chelli identified another man in a photographic lineup—and not Davis—as the individual he had seen holding a club or small bat outside Antonetti's apartment complex on the morning of her assault.[7]

---

[7] We will refer to this man as "the suspect" rather than by name.

19

The police department documents attached to the motion for new trial revealed that at the time of the assault, the suspect lived in the same apartment complex as Antonetti. According to the suspect's roommate, Douglas Cleveland, the suspect said he met a woman from apartment 188—Antonetti's apartment—at the laundry located near her apartment in early October 1985. The suspect told Cleveland that the woman he met invited him to share a bottle of wine and they had sexual relations, but the suspect said he was angry because she later threw him out of the apartment and discontinued any further relationship with him. Cleveland also asked the police investigator, without prompting, whether a baseball bat had been used in the crime because the suspect used to keep one around the apartment although he was not into sports. When the officer asked to see the bat, Cleveland could not find it in the apartment.

Cleveland told officers that on the night before the assault, he and the suspect spent time at a club called Maggie Mae's on Sixth Street, which the police officer noted was where Antonetti had also been seen. Around midnight, the suspect left to take home a friend who was sick, and Cleveland "didn't see [the suspect] again until Sunday during the day or Monday."

The police records also indicate that police questioned the suspect in 1986 while he was in custody for the aggravated sexual assault of a neighbor, which occurred three months after Antonetti's assault. The suspect initially denied ever seeing Antonetti or hearing of her, but then later admitted having seen her during walks to the apartment complex laundromat. The police records also indicate that the suspect failed a polygraph test, and the test examiner opined he was "100% certain that [the suspect] is responsible for the death of Antonetti."

After reviewing this record, inclusive of Davis's motion for new trial and attachments thereto, we conclude there is a reasonable probability counsel's performance in handling the third-party perpetrator evidence fell below an objective standard of reasonableness and there is a

20

reasonable probability that the result of this trial would have been different but for defense counsel's failure to present this evidence to the jury.

### *Evidence of ineffective assistance in record exclusive of motion for new trial*

If we assume that Texas Court of Criminal Appeals precedent prevents us from considering defense counsel's declaration and the other evidence submitted with Davis's motion for new trial because it was not formally admitted during a hearing, this does not end the inquiry into the reasonableness of defense counsel's representation. Rather, we must consider whether the remainder of the trial record, exclusive of the motion for new trial, supports Davis's claim of ineffective assistance. On this record, without taking into account Davis's motion for new trial and any attachments thereto, we conclude that the record still establishes that Davis's counsel provided ineffective assistance.

The trial court record shows that defense counsel's performance fell below an objective standard of reasonableness in failing to present evidence of the third-party perpetrator. Although counsel filed a pretrial brief indicating Davis's intent to introduce evidence of an alternate perpetrator, and the court heard some pretrial argument about the alternate perpetrator theory and referred to it during bench conferences at trial, counsel never put forth the actual evidence in support of the theory and did not obtain a ruling on it from the court. Further, the trial record shows that defense counsel made cumulative errors in the handling of evidence and testimony at trial, failing to object to, and in fact eliciting himself, a variety of extraneous evidence harmful to Davis relating to incidents of aggressive behavior by Davis in the years after Antonetti's murder.

Davis's pretrial brief stated an intention to show that another man, the suspect, committed Antonetti's murder and argued that ample evidence connected the suspect to the crime. Attached to the brief were summaries of much of the evidence discussed above, such as witness

statements from Austin Police Department reports completed during the initial investigation in the 1980s and recorded police interviews with the suspect in 2010. However, counsel failed to attach the actual police reports and witness statements, and he never offered them into evidence at trial. The summaries indicated that police thought the suspect committed Antonetti's murder based on a number of circumstances, including his alleged sexual relations with her, his residence at her apartment complex, his initial denial that he had ever seen Antonetti and subsequent admission that he had, his alleged ownership of a bat, and his weak alibi. And most significantly, the summaries included the suspect's having been tentatively identified by Antonetti's neighbor Chelli in a photographic lineup as the man he saw outside Antonetti's apartment building, appearing tense and holding a club or small bat, near the time of the assault.

Defense counsel neither obtained a ruling on his intention to present evidence of an alternate perpetrator nor made the actual police reports and witness statements the subject of an offer of proof, despite several opportunities to do so before and during trial. At a pretrial hearing on a motion to quash, the trial court stated the defense would have an opportunity to present evidence (instead of merely summaries attached to a brief) about an "alternative perpetrator":

> [State]: Well, I don't know, Judge, if you are ruling on the other issue that has been filed with you, the alternative perpetrator, might shed some light on this.
>
> Court: It is sort of premature for me to do that right now. Again, the burden is on the defendant to show the nexus and the evidence connecting someone else to the offense, not to the apartment complex, not to the date, but to the offense, and I guess at or before trial or before the defense starts, I will give them an opportunity to do that *perhaps with real evidence as opposed to just what they put in a brief.* (Emphasis added.)
>
> . . . .
>
> [State]: Do you want to set that for some kind of hearing today so we know?

22

Court:          Well, we just need to do that as we move along sometime before the defense starts, I guess. . . . So implicit in my ruling in that case is that you can mention [Chelli's statement] during your opening statement. . . . But as to the third party perpetrator, that would be out unless I have ruled on it by then.

On the first day of trial and during a bench conference on the motion in limine, defense counsel argued to the court that even if he could not prove that the suspect murdered Antonetti, he should be allowed to tell the jury that investigators continued eliminating suspects in the case after Davis had already been indicted for Antonetti's murder. The trial court responded that the third-party-perpetrator issue was under advisement:

[Defense]:      This is important. . . . Any evidence or questions related to [the suspect] as a suspect in the case. This has been subject to a lot of motions and briefs on my part. I don't intend to try to prove that he in name committed this offense. I don't think I can do that, but he was a suspect at one point in this case, he was interviewed by the police. He was later approached after my client was indicted [and told by an investigator] we are here to eliminate you as a suspect. I think that is relevant to my defense, that after my client is indicted, investigators go about trying to eliminate other suspects in the case.

Court:          Did you go about eliminating other suspects after this? That is what you want to ask?

[State]:        Well, Judge, [t]hat is just an interview technique he uses to put the person he is talking to at their ease and to make them more likely to give information if that person thinks they will be eliminated.

Court:          I think this is one of the issues under advisement by the Court.

[Defense]:      The reason—

Court:          Any third party perpetrator.

[Defense]:      And it fits a pattern because when they talked to Mr. Chelli on the phone, he also tried to dissuade him as a witness and to run him off as a witness, so if it is a pattern of what the State's investigator—

| | |
|---|---|
| Court: | You may have to bring all that out outside the presence of the jury at 7:00 one night. |

At another bench conference after empaneling the jury, the trial court reiterated that it was still considering the third-party-perpetrator request:

| | |
|---|---|
| Court: | What else? I have still got two things under consideration. The defendant's third party perpetrator request. |
| [Defense]: | Yes. |
| Court: | For evidence based on the brief you filed and the proffer you made, and the State's extraneous offense evidence. |
| [State]: | Right, Judge. |
| Court: | Pending before the Court. |
| [State]: | Right. |
| . . . . | |
| Court: | I will just tell you I am reading a lot of case law on it have not yet decided, because I have to hear more evidence to decide, but each side realizes their issue, they are rolling a heavy ball uphill in their particular issue. Extraneous offenses are generally out, not in, and when they are in, identity is the toughest one. . . . And on yours, as I think even your honest co-counsel pointed out, since *Wiley*, nobody including the courts can find a decision where third party perpetrator came in and was upheld. It is an uphill battle on both sides. |
| [Defense]: | My only unresolved question in my mind, you know, it is not proving a third party perpetrator, discussions about questioning other suspects. |
| Court: | I will hear you on that as being a part of the general investigative process. |
| [Defense]: | Okay. |
| Court: | I haven't—I think you are closer to getting some general statement in than you are a specific statement about a specific individual without a nexus, a real nexus. |

[Defense]:     And you want me to approach before I get into any of that?

Court:         Yes.  I haven't resolved that.  I will hear from the State on that.

[Defense]:     Okay.

However, defense counsel failed to make any further presentation at trial about the issues of a third-party perpetrator, failed to present evidence to prove a nexus between the suspect and the crime, and failed to raise the post-indictment elimination of other suspects generally.

The record before us reflects defense counsel's mistaken belief that he had the burden of proving that the suspect "committed this offense" to present evidence of an alternate perpetrator. The State's brief also points to defense counsel's statement "that he could not directly prove [the suspect] was the perpetrator."  But that was not his burden.  The defense needed to show that the proffered evidence was sufficient to demonstrate a nexus between the charged crime and the alternative perpetrator—not to prove that the suspect murdered Antonetti.  *See Wiley v. State*, 74 S.W.3d 399, 406, 407-08 (Tex. Crim. App. 2002) (concluding that appellant failed to meet burden of showing nexus between crime and alternative perpetrator based on appellant's "nebulous allegation" that "*perhaps* [a third party] was *somehow* involved" in commission of arson).

Defense counsel is presumed to know the applicable law.  *See Ex parte Welch*, 981 S.W.2d 183, 185 (Tex. Crim. App. 1998) (defense counsel's misunderstanding of law governing probation eligibility constituted ineffective assistance of counsel).  "To be reasonably likely to render effective assistance to his client, a lawyer must be sufficiently abreast of developments in criminal law aspects implicated in the case at hand."  *Id*.  Misunderstanding of the applicable law can never be a legitimate trial strategy.  *Garcia v. State*, 308 S.W.3d 62, 75 (Tex. App.—San Antonio 2009, no pet.).  Here, defense counsel's misunderstanding about the predicate for introduction of evidence about a third-party perpetrator was not a legitimate trial strategy and fell below an objective standard

25

of reasonableness. *See id.* at 75-76; *see also Frangias*, 392 S.W.3d at 653 (cautioning courts against second-guessing trial counsel's "informed strategic or tactical decisions").

Further, although the trial court expressed reservations about the third-party perpetrator theory, the record reflects the court's ongoing consideration of the matter. The last word from the trial court was that it had not resolved the issue. Defense counsel was invited by the court and had ample opportunity to proffer evidence—not merely summaries attached to a brief—supporting the third-party perpetrator theory, but that evidence was not provided to the trial court until new counsel filed the motion for new trial. Neglecting further presentation of the available evidence showing a sufficient nexus between the crime and an alternative perpetrator, when the trial court expressed willingness to consider it, cannot be justified on this record as any reasonable trial strategy. *See Andrews*, 159 S.W.3d at 102; *see also Frangias*, 392 S.W.3d at 654 (noting that abandonment of alternative ways of implementing a particular trial strategy is reasonable only if trial counsel undertook reasonable efforts to pursue such alternatives and brought a professionally appropriate level of knowledge and skill to bear before choosing to abandon them).

Having reviewed the trial court record,[8] we cannot conclude that there was any plausible, professional reason for defense counsel's failure to complete his presentation of a third-party-perpetrator theory. *See Bone*, 77 S.W.3d at 836. We conclude there is sufficient evidence in this record establishing that Davis's counsel's performance on this front fell below an objective standard of reasonableness. As such, we proceed to determine whether such deficient performance prejudiced Davis's defense.

---

[8] For purposes of this analysis, we do not consider the declaration and evidence attached to Davis's motion for new trial discussed above.

In applying the second prong of the *Strickland* standard, we must determine whether there is a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's deficiency, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. The State contends that Davis cannot show his counsel's deficient performance or any resulting prejudice because the jury heard Chelli's call to 911 and his description of the person he saw, which did not match Davis. But the fact that the jury heard evidence of a mismatch is qualitatively different from the evidence the jury did not hear, summarized in the pretrial brief, tending to link a specific third-party perpetrator to the crime—Chelli's identification of the suspect from a photographic lineup as the man he saw outside the apartments with a club or small bat on the morning of Antonetti's assault. Without this evidence, the State's attempts to portray Davis as the man Chelli saw, despite the physical differences in his perception, were likely more effective.

If defense counsel had understood the applicable law and completed his presentation of the third party perpetrator theory, particularly with the type of supporting evidence described in his pretrial brief, there is a "reasonable probability" that "the result of the proceeding would have been different." *See id.* Evidence that the suspect was picked out of a photographic lineup as someone seen near Antonetti's apartment, appearing tense and holding a club or small bat, around the time of Antonetti's assault would have been significant in this cold-case prosecution, which relied on a series of circumstantial connections between Davis and the crime. Given an evidentiary nexus between this specific third-party suspect and this crime, there is a reasonable probability that the result of this proceeding would have been different, i.e., there is a reasonable probability this evidence would have been admitted and given one or more jurors reasonable doubt of Davis's guilt. However, because defense counsel failed to pursue the third party perpetrator theory beyond his trial court brief, its attached summaries, and his intermittent trial arguments, the State was able to

27

emphasize to the jury at closing that the trial evidence pointed only to Davis and that Davis was the person Chelli saw on the morning of Antonetti's assault, despite the discrepancies in height, weight, hair color, and physical build.

The United States Constitution ensures criminal defendants will have "a meaningful opportunity to present a complete defense." *Miller v. State*, 36 S.W.3d 503, 506 (Tex. Crim. App. 2001) (quoting *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993)). Defense counsel's failure to complete the third-party perpetrator presentation while the trial court was willing to consider it was a critical lapse that prejudiced Davis by precluding him from fully presenting a defense that he was not the person who committed this crime.

Had defense counsel completed his presentation of the third party perpetrator theory and properly provided supporting evidence to the trial court, there is a reasonable probability that the evidence would have established a sufficient nexus between the alternate perpetrator and the crime, requiring admission of the evidence. In reaching this conclusion, we acknowledge the caution with which our appellate courts have approached the admission of evidence of a third-party perpetrator as well as claims of ineffective assistance of counsel. However, if the standard for admissibility of third-party perpetrator evidence—requiring a defendant to demonstrate that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged "alternative perpetrator,"—is to have any meaning, that standard should be met here, where the only witness near the scene around the time of the crime recounts having seen a man fitting the description of the suspect, not Davis, looking into the windows of an apartment neighboring Antonetti's while holding a club or small bat, weapons capable of inflicting Antonetti's injuries. *See Wiley*, 74 S.W.3d at 406.

28

This evidence is wholly different from the speculative third-party perpetrator allegations of the type that have been rejected by the Texas Court of Criminal Appeals. *See id.* at 406-07. In *Wiley*, the court considered an appeal from an arson conviction against the owner of a restaurant that was failing financially. *Id*. at 401. Trial evidence showed that one month before the fire that destroyed his restaurant, Wiley took out an insurance policy almost doubling his coverage for the building. *Id*. Less than two weeks before the fire, there were several incidents involving gas leaks, combustible containers, and the existence of other dangerous conditions at the restaurant. *Id*. The day before the fire, witnesses saw Wiley's truck at the restaurant with a flat-bed trailer attached, and various witnesses testified to seeing or actually helping him load furniture onto the trailer. *Id*. at 402. At 3:00 a.m., just hours before the fire, a witness saw a trailer packed with boxes and a car, like similar to one belonging to Wiley's girlfriend, parked outside the restaurant. *Id*. & n.3. On the morning of the fire, Wiley woke early with a "bad feeling" and went to check on the restaurant. He walked in, discovered the fire, and reported it to the fire department. *Id*. Investigators determined the fire was intentionally set with gasoline. *Id*. at 402 n.4. Wiley's subsequent insurance claim for damage to his restaurant was denied after an investigation, during which he admitted previously recovering insurance proceeds for two other properties he owned that were also destroyed by fire. *Id*. at 402-03. At his subsequent arson trial, Wiley argued that he should be allowed to tell the jury that a mentally incompetent man, known to be a "fire-starter," had been thrown out of his restaurant a few days earlier and watched it burn (as did other town residents). *Id*. at 403-04 & n.13, 405. Wiley argued that this man had possibly assisted someone else in starting the restaurant fire. *Id*. at 406. The court concluded that Wiley had not shown a sufficient nexus between the alternate perpetrator and the crime, noting his "proffered evidence suggesting that the

mentally incompetent [alternative perpetrator] set this sophisticated fire [wa]s both meager and speculative." *Id.*

Here, unlike *Wiley*, the alternate-perpetrator evidence described in defense counsel's pretrial brief is neither meager nor speculative, there is less direct evidence tending to connect Davis to this crime, and Davis was not the source of the information suggesting a third-party perpetrator. Further, because this record indicates a connection between a third-party perpetrator and the crime with a witness's identification from a photographic lineup, it is distinguishable from the weak third-party perpetrator evidence proffered by defendants in *Wiley* and other cases.[9] *See Wiley*, 74 S.W.3d at 403-04 & n.13, 406-07 (rejecting appellant's theory that perhaps third party was "somehow involved as an assistant to some unknown sophisticated arsonist in burning down appellant's restaurant"); *see also United States v. McVeigh*, 153 F.3d 1166, 1991 (10th Cir. 1998) (cited in *Wiley* and affirming exclusion of "highly generalized and speculative" evidence that members of anti-government group "expressed vague threats to bomb a variety of potential targets in Oklahoma"); *Martinez v. State*, 212 S.W.3d 411, 424 (Tex. App.—Austin 2006, pet. ref'd) (affirming exclusion of evidence in sexual abuse trial that complainant's brother must have been a third-party perpetrator because he previously hugged complainant); *Michaelwicz v. State*, 186 S.W.3d 601, 618 (Tex. App.—Austin 2006, pet. ref'd) (affirming exclusion of evidence in murder trial about third party's misconduct with family members during fifteen-year period after murder occurred). Using the third-party perpetrator evidence described in his pretrial brief, defense counsel could have shown "that his proffered evidence regarding the alleged alternative perpetrator [wa]s sufficient, on its own

---

[9] Chelli's lineup identification is referenced in a summary to the brief supporting Davis's intent to introduce alternate perpetrator evidence. Proof of Chelli's lineup identification is in an exhibit to Davis's motion for new trial and is in the record, although it was not admitted into evidence at a hearing.

or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'" *See Wiley*, 74 S.W.3d at 406. Regrettably, counsel's error in understanding the court's rulings and failing to properly present any third-party perpetrator evidence deprived the court of the opportunity to consider that evidence and prejudiced Davis's defense.

### *Cumulative errors in the handling of evidence and testimony at trial*

The Texas Court of Criminal Appeals has recognized that although a single error might be insufficient proof of counsel's ineffective assistance, counsel's performance taken as a whole may compel such a holding. *Ex parte Welborn*, 785 S.W.2d 391, 396 (Tex. Crim. App. 1990). As such, in assessing whether counsel provided ineffective assistance, the cumulative effect of defense counsel's other deficiencies is worth noting along with counsel's failure to properly present the third-party perpetrator evidence. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect.").

Davis further contends on appeal that defense counsel rendered ineffective assistance by eliciting and failing to object to evidence about several incidents of extraneous acts of aggression by Davis in the years after Antonetti's murder. For instance, defense counsel elicited testimony from Davis's wife Rebecca about an extraneous incident in 2005 involving Davis swinging an ax that Rebecca felt was "aimed at her." There had been no reference to the ax incident before this, and had defense counsel not elicited the testimony, the State likely could not have elicited testimony about it because the State never gave Davis notice of intent to use it at trial. *See* Tex. R. Evid. 404(b).

Next, defense counsel allowed Davis's ex-girlfriend Mudgett to testify repeatedly without objection about her abusive relationship with Davis. Defense counsel admitted to the court

31

that allowing this testimony was not his strategy, but Mudgett blurted it out before he could do anything about it. Counsel did not object, move to strike, or ask for any sort of limiting instruction.

Additionally, counsel asked Davis's friend Bless whether she had ever seen Davis "do anything violent" to Mudgett, opening the door to greater detail about an incident in which Bless saw Davis holding a bat at a party. After defense counsel's question, the trial court allowed Bless to testify further about seeing Davis exit his bedroom while agitated, holding a bat, and seeming to threaten Mudgett with it. Defense counsel stated that he did not think he had opened the door to Bless's further testimony, even though he heard the State's proffer beforehand and knew further detail from Bless about the bat incident could hurt his case "tremendously."

Having reviewed this record, including defense counsel's discussions with the court, we cannot conclude that there was any plausible, professional reason for defense counsel's introduction of Rebecca's testimony about the ax incident, failure to object to Mudgett's repeated testimony about Davis's abuse, and opening the door to further testimony from Bless about the bat-wielding incident. *See Bone*, 77 S.W.3d at 836. Taken cumulatively, these failures by defense counsel further support our conclusion above that Davis's counsel rendered ineffective assistance.

Additionally, considering the second prong of the *Strickland* test, these items of testimony were prejudicial to Davis. *See Strickland*, 466 U.S. at 694. They constituted a significant portion of the case against Davis, and without them, there is a reasonable probability that the result of the proceeding would have been different. Davis's "rage" was a central theme of his prosecution. If defense counsel had not elicited the testimony that he did from Rebecca and Bless, the jury would not have heard evidence that Davis acted aggressively on these later occasions with an ax and a bat, and counsel failed to raise proper objections and secure instructions to disregard Mudgett's nonresponsive testimony or to mitigate the harmful effect of her testimony. *See Ex parte Drinkert*,

821 S.W.2d 953, 956 (Tex. Crim. App. 1991) (holding that defense counsel was ineffective for several reasons, including failure to object to jury argument that "just slipped by" him); *Welborn*, 785 S.W.2d at 396 (holding that defense counsel was ineffective for several reasons, including allowing introduction of extraneous offense during guilt/innocence phase without objection); *Hernandez v. State*, No. 11-11-00123-CR, 2013 Tex. App. LEXIS 6365, at \*16 (Tex. App.—Eastland May 23, 2013, pet. filed) (mem. op., not designated for publication) (holding, without reaching other alleged deficiencies, that defense counsel rendered ineffective assistance by opening the door to extraneous-offense evidence when he asked defendant's ex-girlfriend whether defendant was "violent person"); *Garcia*, 308 S.W.3d at 75-76 (holding that defense counsel was ineffective for several reasons, including opening door to evidence of other bad acts and failing to request limiting instruction); *Brown v. State*, 974 S.W.2d 289, 293 (Tex. App.—San Antonio 1998, pet. ref'd) (holding that defense counsel was ineffective for several reasons and concluding most damaging and prejudicial evidence was admitted only because of counsel's conduct). In closing argument, the State reinforced the harmful effect of this testimony.

The cumulative effect of defense counsel's eliciting or failing to object to evidence about extraneous acts of aggression by Davis in the years after Antonetti's murder, combined with his failure to complete his presentation of the third party perpetrator theory, taken as a whole, compel our conclusion that Davis received ineffective assistance. *See Welborn*, 785 S.W.2d at 396 (considering counsel's cumulative errors); *see also Frangias*, 392 S.W.3d at 653 (noting even single instance of counsel's error that is egregious and has seriously deleterious impact on balance of representation may rise to level of deficient performance). Defense counsel's demonstrated deficiencies on this record undermine our confidence in the outcome of this trial. *See Strickland*, 466 U.S. at 694.

33

Having concluded that Davis presented sufficient evidence establishing that his counsel's performance fell below an objective standard of reasonableness, and that such deficient performance prejudiced his defense, we sustain Davis's ineffective-assistance issue.[10]

## CONCLUSION

Having sustained Davis's ineffective-assistance issue, we reverse the trial court's judgment and remand this cause for a new trial.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton, and Rose

Reversed and Remanded

Filed:   August 30, 2013

Publish

---

[10] Given our disposition of this aspect of the ineffective-assistance issue, we do not reach the issues that: (1) the trial court erred by ruling that marital privilege was inapplicable to comments between Davis and Rebecca; (2) the court erred by denying Davis's motion for new trial alleging that there was sufficient evidence to connect this crime to a third-party perpetrator; and (3) Davis's counsel was ineffective in failing to pursue a spoliation instruction for the lost composite drawing.

34