FILED IN
COURT OF CRIMINAL APPEALS

December 23, 2015

ABEL ACOSTA, CLERK

PD-1371-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/22/2015 7:32:03 PM
Accepted 12/23/2015 7:48:34 AM
ABEL ACOSTA
CLERK

**No. PD-1371-15**

# IN THE TEXAS COURT OF CRIMINAL APPEALS

| | | |
|---|---|---|
| **TERRANCE DEERING BLACK,** | § | |
| **Petitioner,** | § | **COURT OF APPEALS** |
| | § | **IN THE EIGHTH JUDICIAL** |
| **vs.** | § | **DISTRICT** |
| | § | **EL PASO, TEXAS** |
| **THE STATE OF TEXAS,** | § | **08-12-00338-CR** |
| **Respondent.** | § | |
| | § | |

## PETITION FOR DISCRETIONARY REVIEW

**On appeal from Cause No. 296-81761-2012**
**IN THE 296th JUDICIAL DISTRICT COURT**
**COLLIN COUNTY, TEXAS**

**CYNTHIA EVA HUJAR ORR ***
**Bar No. 15313350**
**GOLDSTEIN, GOLDSTEIN**
  **& HILLEY**
**310 S. St. Mary's St.**
**29th Floor Tower Life Bldg.**
**San Antonio, Texas 78205**
**210-226-1463**
**210-226-8367 facsimile**

**CHRISTOPHER M. GRIFFITH**
**Bar No. 24069072**
**LAW OFFICE OF**
  **CHRISTOPHER M. GRIFFITH**
**310 S. St. Mary's St., Ste. 1215**
**San Antonio, Texas 78205**
**210-229-1444**
**210-229-1445 facsimile**

**ATTORNEYS FOR PETITIONER**

ORAL ARGUMENT REQUESTED        *Lead Counsel

## PARTIES TO THE CASE

**The parties to this case are as follows:**

**Representing the State of Texas, at Trial:**

John Schomburger
Justin Johnson
Assistant District Attorneys
Collin County District Attorney's Office
2100 Bloomdale Road, Ste. 2004
McKinney, Texas 75071

**Representing the State of Texas, on Appeal:**

John Rolater
Chief-Appellate Division
Collin County District Attorney's Office
2100 Bloomdale Road, Ste. 2004
McKinney, Texas 75071

**Representing Terrance Deering Black, Defendant, at Trial:**

James D. Burnham
Law Offices of Jim Burnham
6116 N. Central Expressway, Ste. 515
Dallas, Texas 75206-5133

Toby L. Shook
2001 Bryan St., Ste. 1905
Dallas, Texas 75201-6545

Pamela J. Lakatos
P.O. Box 868091-8091
Plano, Texas 75086-8091

**Representing Terrance Deering Black, Defendant, on Appeal:**

Pamela J. Lakatos
P.O. Box 868091-8091
Plano, Texas  75086-8091

The Honorable John Roach, Jr., presided at trial in the 296th Judicial District Court, Collin County, Texas.

# TABLE OF CONTENTS

Parties to the Case ............................................................................................. ii

Index of Authorities ........................................................................................... v

Statement Regarding Oral Argument ................................................................ 1

Statement of the Case and Procedural History ................................................. 1

Grounds for Review:
I. Whether the Court of Appeals applied the wrong legal test to review the trial Court's denial of the motion to suppress in conflict with this Court's decision in *Guzman v. State,* 955 S.W.2d 85, 93 n. 2 (Tex. Crim. App 1997),when it should have reviewed the denial *de novo* in light of the findings of fact and conclusions of law provided by the trial Court during the motion to suppress post hearing colloquy and decision.
.................................................................................................................. 4

II. The Court of Appeal's holding that alternate perpetrator evidence may only be admitted when the Petitioner meets a burden of proof that ties the alternate perpetrator's past conduct against the victim to the commission of the offense against the same victim; is contrary to *Wiley v. State*, 74 S.W.3d 399 (Tex. Crim. App. 2002) that holds a nexus between the alternate perpetrator the offense need be shown by mere logic, reason and a scintilla of evidence, but no particular quantum of proof.
.................................................................................................................. 4

Argument ........................................................................................................... 4

Prayer for Relief ................................................................................................ 16

Certificate of Compliance ..................................................................................

Certificate of Service ......................................................................................... 17

Appendix .............................................................................................................

# INDEX OF AUTHORITIES

**CASES:**

*Black v. State*, No. 08-12-00338-CR, 2015WL5604388 (Tex.App.-El Paso Sept. 23, 2015) ............................................................................................*passim*

*Chambers v. State*, 805 S.W.2d 459 (Tex.Crim.App. 1991) ................................. 13

*Davis v. State*, 413 S.W.3d 816 (Tex.App.-Austin 2013)...................................... 12

*Dickson v. State*, 246 S.W.3d 733 (Tex.App.-Houston [14th Dist.] 2007)....... 12, 13

*Dubose v. State*, 915 S.W.2d 493 (Tex.Crim.App. 1996)........................................ 8

*Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App. 1997) ...............................2, 3, 8

*Hankins v. State*, 132 S.W.3d 380 (Tex.Crim.App. 2004) ...................................... 6

*Potier v. State*, 68 S.W.3d 657 (Tex.Crim.App. 2002)......................................... 14

*State v. Cullen*, 195 S.W.3d 696 (Tex.Crim.App. 2006) ......................................... 4

*State v. Elias*, 339 S.W.3d 667 (Tex.Crim.App. 2011)...................................... 5, 10

*State v. Ross*, 32 S.W.3d 853 (Tex.Crim.App. 2000) ........................................ 5, 10

*State v. Terrazass*, 933 S.W.2d 263 (Tex.App.—El Paso 1996) ............................. 8

*United States v. Stevens*, 935 F.2d 1380 (3rd Cir. 1991) ...................................... 13

*Villa v. State*, No. 04-07-00095-CR, 2008-WL372321 (Tex.App.-San Antonio Feb. 13, 2008) ....................................................................................................... 12, 13

*Wiley v. State*, 74 S.W.3d 399 (Tex.Crim.App. 2002)........................... 2, 10, 11, 14

*Wiley v. Texas*, 537 U.S. 949, 123 S.Ct. 415, 154 L.Ed.2d 294 (2002)................. 11

*Workman v. State*, No. 08-07-00299-CR, 2010WL109704 (Tex.App.—El Paso Jan. 13, 2010) ............................................................................................................. 11

**CONSTITUTION:**

First Amendment United States Constitution ........................................................... 7

**RULES:**

Rule 39.1 of the Texas Rules of Appellate Procedure ............................................... 1

**STATUTES:**

Article 5, § 5(b), Texas Constitution ........................................................... 1

Article 18.20(10) of the Texas Code of Criminal Procedure.................................... 7

## STATEMENT OF THE CASE

Mr. Terrance Black (hereinafter "Black") was convicted and sentenced to 40 years imprisonment for the murder of Susan Loper (hereinafter "Loper"). 1CR23, 19RR89. He timely appealed his conviction and sentence to the Fifth Court of Appeals, which transferred the case to the Eighth Court of Appeals in El Paso. That Court issued an opinion on September 23, 2015, affirming his conviction. *Black v. State*, No (Tex.App.—El Paso 2015)[hereinafter Appendix]. Upon obtaining an extension for this petition for discretionary review from this Court, it is timely filed.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to consider Petitions for Discretionary Review from convictions in criminal cases. Article 5, § 5(b), Texas Constitution.

## STATEMENT REGARDING ORAL ARGUMENT

Because this case presents issues that involve a number of conflicting treatments by Courts of Appeal, this Court should grant Terrance Deering Black, oral argument. Rule 39.1, Texas Rules of Appellate Procedure.

## GROUNDS FOR REVIEW

I.      Whether the Court of Appeals applied the wrong legal test to review the trial Court's denial of the motion to suppress in conflict with this Court's decision in *Guzman v. State,* 955 S.W.2d 85, 93 n. 2 (Tex. Crim. App 1997),when it should have reviewed the denial *de novo* in light of the findings of fact and conclusions of law provided by the trial Court during the motion to suppress post hearing colloquy and decision.

II.     The Court of Appeal's holding that alternate perpetrator evidence may only be admitted when the Petitioner meets a burden of proof that ties the alternate perpetrator's past conduct against the victim to the commission of the offense against the same victim; is contrary to *Wiley v. State,* 74 S.W.3d 399 (Tex.Crim.App. 2002) that holds a nexus between the alternate perpetrator the offense need be shown by mere logic, reason and a scintilla of evidence, but no particular quantum of proof.

## STATEMENT OF FACTS

The pertinent facts are stated below with each ground for review.

## SUMMARY OF THE ARGUMENT

During the course of proceedings, the Trial Court made findings of fact and conclusions of law regarding Petitioner's motion to suppress searches of his home and possessions, pursuant to a search warrant. Upon appeal, the Court of Appeals disregarded the Trial Court's findings, even stating that the Trial Court had not made such findings, and applied an incorrect standard of review, engaging in a

factual review comprised of the very fantasies this Court warned would be incongruent with the facts the Trial Court had found during its review.

The Eighth Court of Appeals requires a impossible nexus to meet as a predicate for alternative perpetrator evidence different than all other Courts of Appeal; obliging the defense to prove the alternate perpetrator has committed the act in question to this same victim previously. Additionally, The Eighth, Fourth, and Fourteenth Courts of Appeals have each stated that it is unclear how much evidence is required to prove the requisite nexus and differ on what the nexus is, which calls for resolution by this Honorable Court.

**ARGUMENT**

I. Whether the Court of Appeals applied the wrong legal test to review the trial Court's denial of the motion to suppress in conflict with this Court's decision in *Guzman v. State,* 955 S.W.2d 85, 93 n. 2 (Tex.Crim.App. 1997), when it should have reviewed the denial *de novo* in light of the findings of fact and conclusions of law provided by the trial Court during the motion to suppress post hearing colloquy and decision.

During the hearing on the motion to suppress, the Trial Court announced that instead of argument he desired for counsel to advise him of what action each desired him to take and the reasoning being that. 3R166. Thus, the Court inquired of counsel concerning the findings of fact and conclusions of law each side desired to be presented orally. The Court then engaged in a colloquy with counsel for the

Defense and the State concerning each warrant, made oral findings of fact and conclusions of law regarding each warrant. 3R167-169. The defense also relied on its full brief of the motion to suppress to establish the law in support of its motion that the defense desired for the Court to find. 3R167.

The Eighth Court of Appeals disregarded these oral findings of fact and conclusions of law and applied an overly deferential standard of review, one that should only be used where the trial Court has not made findings of fact and conclusions of law. In doing so, it engaged in the kind of inference drawing that bore no resemblance to the factual findings that the Trial Court actually made. "Because the trial court did not make explicit findings of fact, we must review the evidence in a light most favorable to the trial court's ruling." *Black v. State*, No. 08-12-00338-CR at *23 (Tex. App. –El Paso Sept. 23, 2015).

Here, trial counsel filed a 150 page motion to suppress addressing seven searches including the early morning search of Terrance Black's home before Susan Loper's body was found and without stating probable cause for the search. During the motion to suppress hearing, counsel requested that the Trial Court make specific findings of fact and conclusions of law. The Trial Court responded by making its essential findings of fact and conclusions of law orally during a detailed colloquy between counsel and the Trial Court, as this Court has held is proper in *State v. Cullen,* 195 S.W.3d 696, 698 (Tex. Crim. App. 2006)[the reasoning for a

court's decision may be preserved via a verbal explanation at the hearing or in express findings of fact and conclusions of law].   Since probable cause is a mixed question of fact and law, this Court has held that a court of appeals reviews the Trial Court's application of the law to the facts *de novo.*  A more deferential review is only applied where the non-prevailing party fails to get the Trial Court's findings on the record. Only then would it be proper to review the Trial Court's findings in such fashion, presuming that the Trial Court implicitly resolved all issues of historical fact and witness credibility in the light most favorable to its ultimate ruling including a presumption that un-contradicted evidence was believed by the Trial Court.

Here, where the Trial Court in proper fashion advised the parties, and the Court of Appeals, of the basis for its ruling during the verbal colloquy with counsel, the review by the Court of Appeals should have been of those findings rather of "appellate assumptions that might be entirely fictitious." *State v. Ross,* 32 S.W.3d 853, 860 (Tex.Crim.App. 2000)[J. Womack concurring]; *State v. Elias*, 339 S.W.3d 667, 698 (Tex.Crim.App. 2011)[quoting *Ross, supra*].

With regard to the first search warrant of Black's home on the early morning of April 20, 2011, the Defense asked the judge to find that there was no probable cause for the search of Black's home since the only information in the warrant was that there was a tumultuous relationship between Black and Loper at some time

years in the past and that there was some sort of hostility by Black toward Loper. However, as in the *Hankins* case, there was no evidence tying Black to the place or commission of the offense and nothing tying his home to the possible location of any evidence of the offense. *See Hankins v. State*, 132 S.W.3d 380 (Tex.Crim.App. 2004) (*overruled on other grounds* regarding jury instructions as to parole eligibility). In fact, Black was not even home.

Therefore, counsel asked the Court to conclude that there was no probable cause to believe that Black committed the offense or that evidence of the offense would be found in Black's home. 3R168. Counsel further asked the Court to find that good faith did not save the search since a good faith exception does not apply if there is no probable cause in the warrant authorizing the search. Id.

Counsel also asked the Court to find that the first search was a general warrant because it authorized the search of any and all evidence without specifying either that the evidence would be found in Black's home or what the items to be seized would be evidence of the offense of murder. 3R168-169 Again, at the time of the search, Ms. Loper's body had not been found and the police were unaware whether she was alive and missing or whether a murder had been committed. The Defense also asked the Court to suppress the search because it did not describe the items to be seized with scrupulous exactitude in the case of speech sought to be seized in violation of the First Amendment. And further asked the Court to find

that the search warrant impermissibly allowed the seizure of private writings in violation of Article 18.20(10) of the Code of Criminal Procedure. 3R169

The Court concluded that the request for a nine millimeter firearm, a woman's swatch watch, Loper's clothing including yoga pants, and blood evidence were specific requests for items of evidence of the offense. 3R169-170. The Court opined that these specific requests could be severed from the more general and unspecified authorizations for a search in the home. However, counsel argued that the general provisions made the entire search a general search for any and all items the police desired including private writings, a computer and First Amendment protected materials. 3R171. And in light of the fact that no offense had yet been established, other than Ms. Loper was missing from work, the search warrant was a general warrant for any and everything.

Understanding what the defense desired the Court to rule and why, the Court indicated it would consider whether to suppress the fruit of the warrant to include the private writings of Black and the contents of a green folder of documents. 3R172. The State presented its requested finding of fact and conclusions of law in an oral colloquy.

The Court discussed his view of the case law and the application of the facts he found to that law and he concluded his colloquy by denying the motion. 3R172-198.

The El Paso Court of Appeals applied a standard of review this Court rejected in *Guzman v. State*, 955 S. W.2d 85, 89n (Tex.Crim.App. 1997) to determine if the Trial Court's ruling on the motion to suppress was correct. And this is not an isolated circumstance. The El Paso Court of Appeals applied the same incorrect standard of review in *State v. Terrazass*, 933 S.W.2d 263, 276 (Tex.App. --El Paso 1996, no pet.) when it cited this Court's opinion in *Dubose v. State*, 915 S.W.2d 493 (Tex.Crim.App. 1996) for the wrong proposition; that a Trial Court's decision should only be reversed on a motion to suppress "when no reasonable view of the record could support the trial court's conclusion viewed in the light most favorable to it". This conclusion and *Terrazass, supra,* is cited by the dissent in *Guzman,* to argue against this Court's majority opinion in *Guzman.* The Court of Appeals applied the same standard of review here, where it upheld the Trial Court's denial of the motion to suppress finding that because a search warrant was involved the Court would apply a highly deferential standard instead of determining questions of law *de novo* and giving full deference to the historical facts that the court finds. The Court of Appeals conducted an evaluation of the Trial Court's ruling by determining if any reasonable view of the record supported the Court's ruling. It did not even discuss the Trial Court's findings of fact and conclusions of law. The Court of Appeals held "Accordingly, when reviewing the magistrate's decision to issue a warrant, we apply a highly deferential standard. …

We will uphold the magistrate's probable cause determination as long as the magistrate had a substantial basis for concluding that probable cause existed." *Black v. State,* No 08-12-00338-CR, slip op at p14 (Tex. App. El Paso 2015). And it further found that it must: "defer to all reasonable inferences that the magistrate could have made." *Id.*

After setting out the search warrant affidavit in its opinion *in toto*, the Court of Appeals engaged in finding inferences that the Court could have engaged in to issue the warrant or to find that its issuance was valid. For example, "The magistrate could have inferred from the affidavit that Catherine Miller was knowledgeable about Susan's relationship with Appellant." *Black v. State,* No 08-12-00338-CR, slip op at p19 (Tex.App. --El Paso 2015). While stating nothing that would allow the inference, it found that "The search warrant affidavit also reflects that Appellant and Susan had a romantic relationship in the past and it is reasonable to infer that he knew where she worked as well as her schedule." *Id.* at p. 20. The opinion further infers that the place to be searched should be Terrance Black's home because it is located within the realm of possible areas that could be reached within fourteen minutes of the North Dallas tollway from the area where Loper's car was tracked as having left the tollway for seventeen minutes.

A problem with this sort of fantastic inference finding, is that Susan Loper's own home was in Frisco, a place that could be reached within fourteen minutes of

the North Dallas Tollway as well. Not only are these inferences fictitious, they are nonsensical.

The El Paso Court of Appeals incorrectly rejected the Trial Court's explicit findings of fact that it properly made through a verbal explanation of its reasoning for its ruling at the hearing on the motion to suppress. The El Paso Court of Appeals made appellate assessments that were entirely fictitious. *See State v. Ross,* 32 S.W.3d 853, 860 (Tex.Crim.App. 2000); *State v. Elias,* 339 S.W.3d 667, 674 (Tex.Crim.App. 2011). It engaged in an overly deferential review of the Trial Court's decision, declining to review the Court's findings of fact and conclusions of law and engaging in assumptions and inferences that were entirely fictitious.

II. The Court of Appeal's holding that alternate perpetrator evidence may only be adimitted when the Petitioner meets a burden of proof that ties the alternate perpetrator's past conduct against the victim to the commission of the offense against the same victim; is contrary to *Wiley v. State,* 74 S.W.3d 399 (Tex. Crim. App. 2002) that holds a nexus between the alternate perpetrator the offense need be shown by mere logic, reason and a scintilla of evidence, but no particular quantum of proof.

While it is understood that the defendant must show a nexus exists between the alleged alternative perpetrator and the offense to establish the threshold necessary to present the defense of an alternative perpetrator, the evidentiary burden the defendant bears in proving this nexus is undefined. *See Wiley v. State*,

74 S.W.3d 399, 406 (Tex.Crim.App. 2002), *cert. denied, Wiley v. Texas*, 537 U.S. 949, 123 S.Ct. 415, 154 L.Ed.2d 294 (2002). The Eighth, Fourteenth, and Fourth Courts of the Appeals have expressly stated this problem exists and have applied differing standards for the nexus and burden of production. Therefore, the issue is ripe and requires this Court's clarification and resolution.

The Eighth Court of Appeals here, stated "it is unclear exactly how much evidence is necessary to sufficiently prove a nexus between the offense and allegedly guilty third party," and defined the nexus as requiring the same prior conduct between the alternate perpetrator and the victim as was committed in the offense. *Black v. State,* No. 08-12-00338-CR, 205 WL 5604338 at *13 (Tex. App.-El Paso Sept. 23, 2015)[not designated for publication] [citing *Workman v. State*, No. 08-07-00299-CR, 2010 WL 109704 at *5-7(Tex.App.-El Paso Jan. 13, 2010, pet ref'd)[not designated for publiction]. This super nexus requirement is more fully set out below.

This Court is presented with an ideal vehicle to grant the petition for discretionary review and answer the questions that have bedeviled the courts of appeal and led to convergent, differing opinions on the matter of alternate perpetrator. These questions are: What is the nexus that must be shown before alternate perpetrator evidence will be admitted in defense of an offense?; and What quantum of proof is necessary to show this nexus, if any?

The Fourth Court of Appeals has determined that the quantum of evidence is more than mere speculation. It stated "[a]lthough **it is unclear exactly how much evidence is necessary to sufficiently prove a nexus between the offense and allegedly guilty third party**, Texas jurisprudence is clear that evidence of third party guilt is inadmissible if it is mere speculation that another person may have committed the offense." *Villa v. State*, No. 04-07-00095-CR, 2008WL372321 at *2 (Tex.App.-San Antonio Feb. 13, 2008)(mem.op.)(emphasis added).

The Third Court of Appeals has held in a case involving incriminating police reports, a self-incriminating statement, and a failed polygraph, that was evidence sufficient to show a nexus for an alternate perpetrator defense to the point that the defense lawyer was ineffective for misunderstanding the predicate necessary to introduce evidence of an alternate perpetrator. *See Davis v. State*, 413 S.W.3d 816, 833 (Tex.App.-Austin 2013, pet. ref'd).

The Eighth, Fourth, and Fourteenth Courts of Appeals have agreed that the level of proof required to demonstrate the required nexus is unclear and each utilizes a different standard in their decisions. The Fourteenth Court of Appeals appears to lay a heavy burden upon defendant; requiring proof that the acts of the alternate perpetrator and the offense are virtually the same, citing to the *Stevens* opinion for support. *Dickson v. State*, 246 S.W.3d at 741. Remarkably, the *Stevens* case had admonished the trial court for imposing too stringent a standard of

similarities. *United States v. Stevens*, 935 F.2d 1380, 1401 (3rd Cir. 1991). The Fourth Court of Appeals seems to require the trial court to usurp the function of the jury and decide, regardless of any jury determination, whether to reject or accept the defendant's own testimony that some other person attacked he and the victim.[1] *Villa v. State,* No 04-07-00095-CR, 2008 WL 372321 at *3 (citing *Dickson v. State,* 246 S.W.3d at 740-41.). This is troubling since the jury is the factfinder at trial, and can choose to believe all, some, or none of the evidence offered. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991). The Eighth Court of Appeals appears to encumber the defense with the heaviest burden of all; to prove the alternative perpetrator has previously committed this offense against this victim. This burden is seemingly impossible in a murder trial.

During the course of proceedings, Petitioner sought to bring evidence showing that a specific alternate perpetrator, Jayson Hayes, the decedent, Susan Loper's most recent paramour, was responsible for the abduction of Loper from her exercise studio and subsequent murder. Petitioner was prevented from putting evidence before the jury that the alleged alternative perpetrator had physically beaten women he had been in relationships with, such as the decedent and that he

---

[1] "Villa's testimony that Gomez attacked him is some\ evidence linking Gomez to the offense, the remaining evidence that Villa sought to have introduced to support his defensive theory was marginally relevant. Basically, Villa sought to introduce evidence that Gomez had committed a similar crime in 1995 for which he was on parole and had also been indicted for a burglary offense in which he used a knife in 2006. This evidence does not tend to connect Gomez to the murder of Dotson, and therefore does not demonstrate the required nexus."

and Loper were in a troubled and discordant relationship at the time of the offense. The exclusion of this evidence diluted Petitioner's trial defense, that Jayson Hayes was in fact the perpetrator and that Petitioner had been wrongfully accused. Exclusions of evidence are unconstitutional when they significantly undermine fundamental elements of the accused's defense. *See Potier v. State*, 68 S.W.3d 657, 666 (Tex.Crim.App. 2002). Evidence regarding the alleged alternative perpetrator's motivation for killing decedent, resorting to physical violence amidst relationship problems, was such a vital portion of Petitioner's defense that exclusion of this evidence effectively precluded him from presenting a defense. *See id* at 665; *Wiley v. State*, 74 S.W.3d at 405. While Petitioner was able to show Hayes' presence at the scene of the offense through the presence of Hayes' fingerprint on a bloody, knocked over, privacy screen at the scene, *See* 13R57-59, without being able to show motive for the attack, Petitioner was unable to show the jury <u>why</u> Hayes would have attacked and killed decedent and the prosecution's assertions that Hayes was a loving paramour were unanswered. However, the State was not precluded from putting on evidence that the Petitioner had a prior relationship with Ms. Loper. And the State was permitted to put on Loper's mother's speculation that Petitioner was obsessed with Ms. Loper, because Petitioner said that the alternate perpetrator Jason Hayes was bad for Ms. Loper because he was a "bad boy" type.

The Trial Court initially denied the defense from putting on alternate perpetrator evidence regarding Hayes assaulting his ex-wives following a hearing. *See* 10R119-121. During the course of this hearing, Hayes' first wife recounted that Hayes physically assaulted her, once because he had become angry that she had purchased clothing for work and another time because he did not approve of the outfit she was wearing. *See* 10RR60-61. She stated that he had a "flash temper," see 10R62, was emotionally abusive, see 10RR57, and had a bad reputation for violence towards women with whom he shared a relationship. *See* 10R55. She did not report this abuse to police. See 10R57. This fact alone may account as to why there is no direct evidence Hayes had previously assaulted the decedent. Hayes chose submissive women who tolerated his violence and did not report it.

Hayes second wife testified that he had also physically abused her during an argument and, immediately prior to this abusive incident, had taken her keys, cell-phone, and had removed the other phones in the house. See 10R68. This *modus operandi*, to remove available means to call for help, closely resembles the fact that Loper's purse and cell-phone were recovered in the alley behind her studio. See 9R201-202 and 11R151. Another witness also testified that Mr. Hayes has a reputation for being violent towards women with whom he had a relationship. See 10R111-112.

The State's opening put forth their theory of the offense, that the perpetrator was someone who did not know how to use a pistol due to live rounds found at the crime scene, was physically strong enough to carry Susan Loper's 117 pound body, and who must have known Ms. Loper's schedule. See 9R27-28. Hayes testified that he was a physically fit, 290 pound ex-college football player, see 17R58-59, who was not familiar using handguns. See 17R68. Hayes also testified that Loper had a set routine, that he was familiar with, and then gave turn-by-turn directions as to how Loper traveled to work, where she was abducted. See 17R25-26. He also testified that he did not have an alibi until approximately 8:18 the morning of the offense. See 17R76. Loper was abducted at approximately 6:00 that morning. See 9R27. One of Loper's clients testified that she had moved her appointment up to 6:15am two weeks prior to the offense, see 9RR128, something more likely to be known by Loper's current paramour than the Petitioner. An investigating officer also testified as to text messages between Loper and her friends revealing that Loper and Hayes' relationship was undergoing problems. See 14R180-185.

Hayes testified that he had previously helped Loper move her exercise equipment and plants out of the exercise studio. See 17R18. A former client of Loper's, who arrived for a workout class the morning Loper was abducted, testified that she did not see that anything had been moved, that a plant had been overturned, and pointed out this plant in a photograph she took that morning. See

9R144, 150, 157. A responding officer testified that he observed plants knocked over at the scene. See 9R281. The defense later reurged their request to put on this alternative perpetrator defense, after all the above testimony, but were again denied. See 17R55-57, 83-85. The Trial Court excluded this evidence of Hayes' prior physical abuse despite the required nexus being shown between Hayes and his prior acts to his bad relationship with Loper at the time and mistreatment of her, ultimately tying him to her murder. Nobody that worked with Loper had ever seen Hayes at Loper's studio. Hayes struck women with whom he had a relationship, he was arguing with Loper, he lied about helping her move from her studio to explain his fingerprints on her overturned, bloody studio screen, and she had been bludgeoned to death.

Three separate Courts of Appeals, including the Eighth Court of Appeals in this case, utilize different standards for the nexus that needs to be shown with differing levels of required similarity, have each stated and it is unclear exactly how much evidence is necessary to sufficiently prove a nexus between the offense and a guilty third party. A fourth Court of Appeals has held trial counsel is ineffective for failing to present an alternate perpetrator when only hearsay and inadmissible evidence pointed to the existence of such a person. This Honorable Court should grant review to establish what the nexus is that needs to be shown and by what quantum of proof, if any.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Petitioner prays this Honorable Court to grant his Petition for Discretionary Review and for any and all other relief this Court deems fit in law or in equity.

Respectfully Submitted:

By: _/s/Cynthia E. Orr_____
    Cynthia E. Orr

CYNTHIA E. ORR
Bar No. 15313350
GOLDSTEIN, GOLDSTEIN & HILLEY
310 S. St. Mary's St.
29th Floor Tower Life Bldg.
San Antonio, Texas 78205
210-226-1463
210-226-8367 facsimile


CHRISTOPHER M. GRIFFITH
Bar No. 24069072
LAW OFFICE OF
    CHRISTOPHER M. GRIFFITH
310 S. St. Mary's St., Ste. 1215
San Antonio, Texas 78205
210-229-1444
210-229-1445 facsimile

Attorneys for Petitioner,
TERRANCE DEERING BLACK

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document does comply with the word-count limitations of Tex. R. App. P. 9.4(i)(2)(D) because it contains 3,937 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

By: _/s/Cynthia E. Orr_____
Cynthia E. Orr

**CERTIFICATE OF SERVICE**

This certifies that a true and correct copy of the foregoing Petition for Discretionary Review was served on Assistant District Attorney Libby Lange (llange@co.collin.tx.us) at the Collin County District Attorney's Office, and State Prosecuting Attorney Lisa C. McMinn (information@spa.texas.gov) on this the 22nd day of December, 2015.

By: _/s/Cynthia E. Orr_____
Cynthia E. Orr

# APPENDIX



§

TERRANCE DEERING BLACK,            No. 08-12-00338-CR

§

      Appellant,                 Appeal from

§

v.                           296th District Court

§

THE STATE OF TEXAS,          of Collin County, Texas

§

      Appellee.            (TC # 296-81761-2012)

§

## O P I N I O N

Terrance Deering Black appeals his conviction of capital murder. A jury found Appellant guilty, and because the State did not seek the death penalty, the trial court automatically sentenced Appellant to life imprisonment. We affirm.

### FACTUAL SUMMARY

Susan Loper began dating Appellant in the Spring of 2006. She was married at the time to Craig Loper and they had a young son, but the marriage became strained because Craig worked out of town for extended periods. The Lopers divorced in 2007. Appellant and Susan dated for approximately a year on a steady basis and then off-and-on until late 2009. She became pregnant with Appellant's child in May 2009, and opted for an abortion. They broke up permanently in August 2009.

Susan met Jayson Hayes through eHarmony in January 2010 and they began dating the

following month. Appellant became aware of the relationship and he took flowers to Susan's mother, Katherine Miller, for her birthday in May 2010. Appellant told Miller that he knew about Jayson and Jayson "had baggage." Miller described Appellant as "very agitated" and obsessive when he was talking to her about Susan. Appellant also told Miller that he did not understand why Susan liked "bad guys" and he expressed his belief that he, Susan, and her son would make such a nice family. Susan continued to date Jayson until her death in April 2011.

Susan taught Pilates at the Gleneagles County Club in Plano. She had been teaching there for sixteen years, but had decided just a few months prior to her death to move her Pilates studio to a different location and start her own business. Her last scheduled day to teach at Gleneagles was April 19, 2011. Susan's mother and father stayed at her home during the work week to care for her eight-year-old son. Miller recalled that Susan kept a strict schedule during the work week. Her routine included leaving the house every morning between 5:15 and 5:30, stopping at Starbuck's for coffee, and arriving at the Pilates studio around 6. When Miller arose on the morning of April 19, 2011, Susan was already gone and Miller assumed that she had left for work at the usual time.

Terry Kennedy had a standing appointment with Susan at 6:15 a.m., but when she arrived at the studio, Susan's car was not in the parking lot and the studio's lights were off. Kennedy was surprised because Susan never missed her appointments. Susan did not respond to Kennedy's text message.

A short time later, Cruz Hernandez, who worked in housekeeping at Gleneagles, found a purse on the ground by the backdoor of the Pilates studio. The purse's straps were caught in the

door. Hernandez notified his supervisor, Egobio Mendoza, about the purse and Mendoza collected the purse and turned it over to Human Resources. Neither man looked inside of the purse.

At approximately 10 a.m., other Pilates clients arrived at the studio for class, but Susan was not present and the lights were still turned off. Another Gleneagles employee stopped by and turned on the lights. One of the women, Laura Curran, noticed that a room divider had fallen over onto a piece of equipment, a plant had been knocked over, and other items were on the floor. The women notified the club's general manager who asked the receptionist to look inside of the purse found earlier that morning. When they realized it was Susan's purse, the general manager called the police.

Officer Joel Scott was the first police officer at arrive at Gleneagles. He saw that a room divider and plant had been knocked over and a Starbucks coffee cup had been spilled onto the floor. He also saw blood on the floor along with an unfired round of ammunition. Scott made these observations from a distance because he did not want to walk through the crime scene. Based on his observations, Scott called his supervisor and requested backup. Several officers arrived, including Detective Scott Epperson.

After waiting for the crime scene investigators to finish with their tasks, Epperson examined the crime scene. Like Officer Scott, he observed that the area around Susan's desk was in disarray and it appeared that there had been a struggle. He found blood and two unfired nine millimeter cartridges on the floor. Epperson found a significant amount of blood on the driveway in front of the building, a small amount of blood outside the back door to the Pilates

studio, a small amount of blood in the Pilates studio, and another unfired nine millimeter cartridge in the bushes outside of the building's front door. Epperson also noticed a Starbucks cup on the floor which had a time-stamped receipt on it showing it had been purchased at 5:45 that morning.[1] After learning that Susan's purse and cell phone had not been taken, but her car keys and SUV were missing, Epperson concluded that this was not a robbery. Based on the evidence, he instead believed that Susan had been "violently kidnapped" at around 6 a.m. and injured in the course of the kidnapping. Epperson was able to narrow the time of the offense to 6 a.m. because Susan had purchased coffee at Starbucks at 5:45 a.m., and Susan and her SUV were missing from the facility at 6:15 a.m. when Susan's first client arrived.

Detective Bruce Pfahning called Susan's current boyfriend, Jayson Hayes. When Pfahning told him that Susan was missing, Jayson initially did not believe the detective. Jayson at first said that everyone loved Susan, but he then identified Appellant as someone who did not like her. In Pfahning's opinion, Jayson was extremely cooperative and his response was consistent with someone who had just gotten bad news about a girlfriend.

Detectives Epperson and Pfahning went to Susan's home to speak with her parents. Craig Loper and two of Susan's friends, Melanie Malone and Julie Mitchell, were also present at the house and Jayson arrived later. Detective Epperson spoke with Jayson, and consistent with Pfahning's earlier assessment, he observed that Jayson was cooperative and willing to answer his questions. Based on statements made by nearly everyone present, Appellant became a focus of the investigation into Susan's disappearance. The detectives went to Appellant's residence in

---

[1] Records maintained by Starbucks showed that Susan's Starbucks card had been used to purchase coffee at 5:45 that morning at a Starbucks located near Gleneagles Country Club.

Frisco but he was not at home.

Detective Fred Garcia reviewed security video recordings from Gleneagles Country Club. The video quality is poor and the area is poorly lit, but the video depicts a vehicle pulling into the parking lot at approximately 5:55 a.m. and parking off-camera.[2] Moments later, a person can be seen walking towards the Pilates studio but the image is obscured by trees and foliage. At around 6 a.m., a person can be seen walking toward the area where the vehicle parked and seconds later, a white SUV with its headlights illuminated pulled up to the driveway by the Pilates studio.[3] At 6:01 a.m., the driver exits the vehicle, leaves the driver's side door open, and walks around the front of the SUV toward the Pilates studio. Less than a minute later, a person is seen walking from the rear of the SUV to the driver's door which is still open. The same person walks back around the rear of the vehicle and is obscured from view for about one minute before walking around the front of the car and getting in the driver's seat and closing the door. The vehicle drives away at approximately 6:02. Blood was found on the circular drive near the location where the SUV had stopped. After reviewing this video evidence as well as the other evidence in the case, the detectives believed that Susan had been abducted by one perpetrator.

Susan had a "Tolltag" for her white Toyota RAV4 and records related to her account assisted the investigators in their search for Susan and her SUV. The Tolltag records showed that her SUV entered the Dallas North Tollway on April 19, 2011 at 6:12 a.m. at the Parker Road entrance traveling northbound. The car exited the tollroad at 6:16 at the Lebanon exit in Frisco,

---

[2] The time-stamp on the video showed that the vehicle pulled into the parking lot at 5:48 a.m., but Detective Fred Garcia testified that the time-stamp on the video is off by about seven minutes.

[3] The video showed that a small white SUV pulled up at approximately 5:53, but the detective who obtained the video recording confirmed that the time-stamp on the video is off by about seven minutes.

which is where Appellant lived. At 6:36 a.m., Susan's SUV re-entered the tollroad at the Lebanon entrance traveling southbound. Two minutes later, the SUV exited the tollroad just prior to the Parker Road exit, but it re-entered the tollroad at Parker Road. The records did not show any other transactions. This meant that the SUV exited the tollroad at a free exit. The detectives knew from the Tolltag records that Susan's SUV had most likely exited the tollroad in the vicinity of the Country Club, so they focused their search for Susan's SUV in that area. A patrol officer found Susan's locked car in the parking lot of an apartment complex less than one mile from the Country Club. Based on the video and Tolltag evidence, the investigators concluded that Susan's abductor had parked his own vehicle in this area, walked to the Gleneagles Country Club and abducted Susan, and then later returned in her vehicle to pick up his own vehicle.

Detective Pfahning found blood and hair on the SUV's right-front passenger window. He also saw a large amount of blood in both the front and back seats, as well as a bloody handprint on the outside of the SUV. There were no distinguishable fingerprints on that handprint which led Pfahning to conclude that the person who left the print had been wearing a latex glove.[4] Green vegetation was found in the SUV's front grill, the right-front floor mat, and the right-front front running board.

Detective Epperson obtained a search warrant for Appellant's home and officers executed the warrant at 5:30 a.m. on April 20, 2011. Appellant was not at home, the house was clean and orderly, and officers found no blood evidence. They also did not find a nine-millimeter gun or

---

[4] At the time of the offense, Appellant was attending night school at Sanford Brown College which has programs related to the medical field. Students have access to latex gloves.

bullets.

The police then focused their search for Susan in Frisco near Lebanon Road because the Tolltag records showed that Susan's SUV exited there. Officer Joel Scott began looking in fields in the area and he found fresh tire marks headed into one field. He followed the tracks on foot and eventually found Susan's body at 8:35 a.m. on April 20, 2011. Officers also found two unfired nine millimeter bullets within fifteen or twenty feet of Susan's body.

Robert Laughon, a field agent for the medical examiner's office, went to the location where Susan's body was discovered. His initial examination revealed that the back of Susan's skull was "eggshell", meaning that it was completely fragmented and "caved in." The medical examiner subsequently determined that Susan died as the result of blunt force trauma to her head. She had sustained one blow to her forehead and at least seven blows to the back of her head with a hard object. Her injuries could have been caused by someone striking her head with a handgun. In the medical examiner's opinion, the beating suffered by Susan indicated that the perpetrator had an intent to kill.

One of Appellant's neighbors, Jocelyn Humphries, sent Appellant a text message expressing sympathy for what had happened to Susan and offering assistance to him. Appellant sent her a reply text stating, "What happened to Susan? I've been out of town since Monday." Given that Appellant seemed to be unaware, Humphries did not want to break the news to him by text, so she suggested that Appellant give her a call when he had a chance. Appellant called Humphries about twenty minutes later and she told him about Susan. Appellant seemed upset and Humphries asked him when he had last spoken with Susan. Appellant replied that he last

saw Susan in December 2010. He also told Humphries that he was in El Paso because he needed to get away.

Detective Jeff Rich contacted Appellant's cell phone provider, AT&T, on April 19, 2011 when the investigation began and learned that his cell phone was in New Mexico. The police subsequently obtained Appellant's cell phone records. Contrary to Appellant's statement to Humphries that he had been in El Paso since Monday, April 18, 2011, his cell phone was in Frisco at 7:28 on April 19, the morning of Susan's disappearance. Twenty-nine minutes later, at 7:57 a.m., Appellant's cell phone was southwest of Frisco in "The Colony" on Main Street. Police later found a sales receipt in Appellant's Escalade showing he bought gas in The Colony on April 19 at 8:09 a.m. The cell phone records showed that Appellant's cell phone began traveling west on the morning of April 19. According to the records, Appellant's cell phone was in El Paso at 6:29 p.m. and it entered New Mexico at 9:40 p.m. The following day, Appellant traveled through New Mexico and arrived in Flagstaff, Arizona at 2:44 p.m.

On April 22, 2011, park rangers at the Grand Canyon responded to a call involving a man panhandling at a scenic overlook. They located the man, later identified as Appellant, and saw that he was talking to a group of about six people. The rangers approached him and asked for identification, but he claimed that he did not have any ID because he had lost his money belt. Appellant told the rangers his name was Jeffrey Stevens and he gave them a date of birth, but the dispatcher notified the rangers that there was no one with that name and date of birth. Appellant told the rangers he was going to look for his money belt and he started walking down a trail. The rangers ordered him to stop, but he continued down a steep slope at the edge of the canyon and

- 8 -

suddenly jumped into the canyon. Appellant landed twenty-five feet below in a sloped area with a thicket. He appeared unconscious at first, but he sat up and began moving around. The rangers yelled at him not to move because he was in danger of sliding down the slope and falling into the "real Grand Canyon." A tactical rope team was able to eventually reach Appellant and they removed him from the canyon. One of the rangers found Appellant's driver's license partially buried in the dirt near where they found him. Two days later, the park rangers went back to the area where Appellant had fallen to conduct a search for any other items he might have discarded. One of the rangers found Appellant's key fob to his Escalade partially-buried in the dirt. Two days later at a different location, a ranger found a hand-written note which read: "family, so sorry for all of the pain. I've been in pain for awhile now. Debts were too high, school too long and made too many mistakes in life. Thanks for all you have done, especially Wendi and her support. I just can't mooch any longer. Pray for me. Love you all, Rance." The other side of the note had the message, "extremely depressed, someone killed Susan. She was amazing." Detective Epperson traveled to Arizona on April 22, 2011 and obtained a search warrant for Appellant's Escalade. In the vehicle, officers found a large amount of clothes, a suitcase, two laptops, an iPhone, and a passport. The laptops were forensically examined. The examination showed that Appellant had been accessing Susan's emails as recently as the day before the offense. Significantly, Appellant had accessed an email Susan sent to a client on the afternoon of April 18, 2011. Susan advised her client that the following day would be her last at Gleneagles Country Club and she would be at the Pilates studio by 6:30 a.m. Appellant also had a photo of Susan and Jayson taken on Valentine's Day in 2011 and the image had been named, "Whore."

In addition to the evidence Appellant had been cyberstalking Susan, there was other evidence showing he had been obsessed with her since their break up in 2009. Detective Rich found multiple entries on the "Calendar" portion of Appellant's iPhone which formed something resembling a journal. On November 29, 2009, the entry read, "lost her again, fucking eHarmony." He wrote on December 13, 2009, "last time I saw her" and "God must help." His entry on April 20, 2010, "Buy G." which could be interpreted as a reference to buying a gun. The entry for May 3, 2010, said "D day sl gotta go can't let a bastard have my hard work." Appellant wrote on December 9, 2010, "Decision day for smoke her." The entries for March 11, 2011 and April 4, 2011 simply state, "Smoker." Evidence showed that Appellant purchased a Ruger P95 nine-millimeter handgun and two boxes of ammunition on June 21, 2010. The unfired nine-millimeter bullets found at Gleneagles and in the field near Susan's body were the same brand as one of the boxes of ammunition purchased by Appellant. A firearms expert, Detective Luke Grant, offered an explanation for the unfired rounds found in both locations. The Ruger model purchased by Appellant has a safety. If a person unfamiliar with this type of firearm attempts to fire it when the safety mechanism is engaged, a live round will be ejected. One of Appellant's friends testified that Appellant did not have an interest in guns and was not knowledgeable about them.

A head hair recovered from the driver's side of Susan's SUV had similar microscopic characteristics to Appellant's known head hair. A DNA profile from the gearshift of Susan's car was consistent with a mixture from Susan, Appellant, and an unknown individual. Appellant's identifiers were present at only twelve of the fifteen locations tested, but the

probability of selecting an unrelated person at random who could be a contributor to the profile is approximately one in 4.697 million for Caucasians, one in 4.566 million for Blacks, and one in 7.825 million for Hispanics. The driver's seat headrest was swabbed for DNA and that DNA profile was consistent with a mixture from Susan, Appellant, Jayson, and an unknown individual.

The State presented Jayson Hayes' testimony to establish his activities in the days leading up to and on the morning of the offense. Jayson testified that he had been helping Susan get ready to move her Pilates studio to the new location. He and Susan spent several hours together on Easter Sunday, but they did not see each other on Monday, April 18, 2011. They planned to meet on the afternoon of April 19 to move the studio to the new location. On the morning of April 19, Jayson got up at about 6:15 a.m. and did his exercise program before getting ready for work. He is a pharmaceutical representative and was scheduled to go to several doctor's offices that day. He left his home in Arlington and went to the office of Dr. Burlyn Nelon in Burleson. As part of his job, Jayson uses a company iPad to make entries indicating he delivered pharmaceutical samples to the doctor's office and the physician is required to electronically sign indicating receipt of the samples or products. The system automatically records Jayson's log-in time as well as the time the doctor signs for the samples. Jayson testified that he does not log into the iPad until after he has looked at the sample closet and made a determination whether the doctor's office needs samples. If the doctor needs samples, Jayson logs the lot number and exact amount of samples into the system so the doctor can sign for the samples. On some occasions he has to wait for the doctor and he also spends time discussing the clinical data and benefits of the pharmaceutical products with the doctor. Records reflect that Jayson logged into his company

iPad at 8:02 a.m. and Dr. Nelon signed the electronic form at 8:18 a.m. Dr. Nelon confirmed that he signed for the samples as shown in the records and he recalled that there was nothing unusual about Jayson's demeanor that morning.

Appellant presented an alternative perpetrator defense at trial. During his opening statement, defense counsel argued that the case was a "rush to judgment," and by 6 p.m. on April 19, 2011, law enforcement had decided that Appellant was the only suspect and they never considered Jayson Hayes to be a suspect. The evidence showed that the police did not search Jayson's house, car, cell phone, or computers. Detective Epperson never considered Jayson a suspect and he did not interview either of Jayson's ex-wives. Further, defense counsel brought forward evidence that Jayson and Susan had broken up one month before the offense and had a contentious relationship at the time of the offense as evidenced by their text messages.[5] Counsel also focused the jury's attention on evidence showing that Jayson knew Susan's work schedule, his fingerprints were found on the privacy screen which had been knocked over at Gleneagles, his DNA was found on the headrest and gearshift of her car, and it was Jayson who first mentioned Appellant's name to the police as a suspect. The defense also presented evidence that Jayson could have committed the offense and still arrived at Dr. Nelon's office by 8:02 a.m. on the morning of the offense. Cami Sandifer, a private investigator employed by the defense, testified that she attempted to determine whether she could drive from the southbound exit on Dallas North Tollway at Parker Road at 6:38 in the morning, drive to the apartment complex where the victim's SUV was abandoned, and then drive to Dr. Nelon's office arriving by 8:02 in the morning. On her first attempt, Sandifer was slowed by construction as well as an accident

---

[5] The evidence showed that the break-up lasted only a few days.

and the trip took her a total of ninety-three minutes. She believed that the traffic congestion added nine or ten minutes to the trip. Several days later, Sandifer made a second attempt and drove a different route. This time, the trip took only seventy-three minutes.

Susan's hair stylist, Deanna Howard, testified for the defense that Susan had been her client for several years and she had met Jayson in January 2011. Jayson called Howard in late March 2011 and talked to her about arranging spa services as a gift for Susan's upcoming birthday. Howard does not provide spa services but she obtained information for him. Howard saw Susan at her April 9, 2011 appointment, and she recalled that when they talked about Jayson, Susan's demeanor was "flat." When Howard heard that Susan was missing, she called the Plano Police Department and gave them Jayson's phone number.

The jury rejected the alternative perpetrator defense and found Appellant guilty of capital murder. Because the State did not seek the death penalty, the trial court automatically sentenced Appellant to life imprisonment.

## THE FIRST SEARCH WARRANT

In his first Issue, Appellant challenges the trial court's ruling denying his motion to suppress evidence seized as a result of the search warrant for Appellant's home executed during the early morning hours of April 20, 2011. He contends that the search warrant did not establish probable cause to believe evidence related to a crime would be found in his home.

### *Standard of Review*

When reviewing a trial court's ruling on a motion to suppress, we generally utilize a bifurcated standard which requires us to give almost total deference to the trial court's findings

of historical fact and review conclusions of law *de novo*. *State v. McLain*, 337 S.W.3d 268, 271 (Tex.Crim.App. 2011). A different standard is required when the case involves a motion to suppress evidence seized pursuant to a search warrant. *See id.* In that situation, a trial court is limited to the four corners of the affidavit supporting the warrant; consequently, the court makes no factual or credibility determinations. *Id.* Accordingly, when reviewing the magistrate's decision to issue a warrant, we apply a highly deferential standard. *Id.* We will uphold the magistrate's probable cause determination as long as the magistrate had a substantial basis for concluding that probable cause existed. *Id.*; *Robinson v. State*, 368 S.W.3d 588, 598 (Tex.App.--Austin 2012, pet. ref'd). This standard is consistent with the constitutional preference that searches be conducted pursuant to a warrant. *McLain*, 337 S.W.3d at 271; *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex.Crim.App. 2007).

Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a fair probability that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued. *State v. Jordan*, 342 S.W.3d 565, 568-69 (Tex.Crim.App. 2011). We are instructed to avoid interpreting the affidavit in a hyper-technical manner. *McLain*, 337 S.W.3d at 271. Further, we must defer to all reasonable inferences that the magistrate could have made. *Rodriguez*, 232 S.W.3d at 61; *Robinson*, 368 S.W.3d at 598.

*The Affidavit*

Detective Epperson's probable cause paragraph stated the following:

On April 19, 2011 at about 10:56 am, Plano Police Officer J. Scott # 1423 was dispatched to a report of a burglary at the Gleneagles Country Club located at

- 14 -

5401 W Park Blvd, Plano, Collin County, Texas.  Officer Scott was directed to the smaller free standing building just east of the main club house known as the 'Golf Teaching Center.'  Call notes on Officer Scotts [sic] computer indicated one of the rooms inside the building was in disarray.  Upon his arrival, Officer Scott was contacted by the Gleneagles General Manager, Michael Wszolek, along with two pilate [sic] students, Lisa Bacic and Laura Curran.  Officer Scott was advised by Bacic and Curran they had arrived at said location for their pilates class which was to have taken place at 1000 hours and was to be given by their long time friend and instructor, Susan Loper W/F/xx/xx/xxxx [birthdate redacted].  Bacic and Curran could not find Loper at said location and Loper's vehicle, a white 2010 Toyota RAV-4 was not parked in its usual position near the tennis courts.  Curran advised in a written statement to Officer Scott upon entering the workout area of said building, 'We then noticed that the office area of the studio was messy, and we moved closer to see a broken jar, a plant dumped over, a box and capsules, a bullet (actually we didn't notice the bullet until later), a coffee cup, a small tote bag and spilled liquid on the floor.  The screen used to separate the office area from the exercise equipment was laying on a gravity bench like it had been tipped over.  We walked around some more and found glass shards over by the mats to the right and mud on the pink mat.'  Officer Scott entered said workout room and noticed an apparent struggle had taken place.  Officer Scott noticed what appeared to be blood on the floor and also observed a live bullet as well.  No person on property could locate Susan Loper nor her vehicle.

Affiant arrived at the location to investigate the disappearance [sic] of Loper.  Affiant was advised of additional apparent blood found in two different locations outside of said building.  Affiant noticed one area of blood was near the curb next to the driveway leading to the front door of said building.  Affiant was advised a total of three live bullets were found in the area and all were CBC 9mm Luger bullets with a round nose.  Manager Wszolek was able to provide personal information for Loper which was used to contact Loper's mother, Catherin [sic] Miller, who was staying at Loper's residence in Frisco, Texas.  Miller was able to provide the license plate for the above listed vehicle as BR4C986.  Affiant spoke with Curran and Bacic who advised they had known Loper for several years and it was highly uncharacteristic for her to miss a pilates class.  Affiant learned at the scene, Miller also did not know of Loper's location.  Affiant was advised by Plano Police Detective Spillman, who was also at said location, Loper's purse had been located just outside of an exit door near the back of said location and the only apparent missing item from said purse was her vehicle keys.  Affiant has learned many of Loper's personal items and valuables were left in said purse along with her Texas Driver's License.  Loper's cell phone was also found inside the purse.  Affiant was advised by Curran and Bacic they were certain Loper would not voluntarily leave her purse or cell phone behind.

- 15 -

Affiant went to Loper's residence in Frisco, Texas to contact Miller for more information. Present with Catherine Miller was Loper's father, Morris Miller, along with Loper's ex-husband, Craig Loper. At this point these individuals realized the great possibility that Loper had been the victim of foul play. All three individuals expressed concern about an individual named, Terrance 'Rance' Black, who was Loper's ex-boyfriend. Affiant was soon able to fully identify Black as Terrance Deering Black W/M/xx/xx/xxxx with TX DL# xxxxxxxx [birthdate and driver's license number redacted]. Said DL showed home address for Black to be 9111 Rio Blanco Drive Frisco, Denton County, Texas. Miller advised Loper and Black had been involved in a relationship that ended badly when Black become 'obsessed' with Loper and his actions toward her were described as 'smothering.' Craig Loper advised Affiant after he and Susan Loper were divorced, he (Craig Loper) was involved in a physical alteration at Susan Loper's residence because Black became extremely agitated and combative toward Susan Loper. Affiant was advised by Miller, Black has tried on numerous occasions to re-establish a relationship with Susan Loper but each time Susan Loper refused. Affiant's investigation revealed Susan Loper had worked at the Gleneagles Country Club for several years and Black was familiar with her work location and schedule. Affiant understands Susan Loper recently complained to her friend, Pat Smerge, Black had recently attempted to give Susan Loper gifts which she refused, resulting in Black becoming angry. Before leaving said residence, Affiant was advised Susan Loper may have been wearing a red women's pilates jacket, black 'yoga' pants, and a 'swatch watch' on the morning of April 19, 2011.

Affiant went to Black's residence at 9111 Rio Blanco Drive, on the afternoon of April 19, 2011 and was unable to contact him. Affiant realized that Black's residence was located west of the North Dallas Tollway and north of Main Street in Frisco, Texas. Affiant travelled via the North Dallas Tollway in order to arrive at Black's residence.

Affiant has viewed the security camera footage from the morning of April 19, 2011 of the area in front of the above listed building already identified [as] the Golf Teaching Center. Affiant noticed that prior to 0600 am, a white vehicle matching the description of the above listed Toyota RAV-4, stopped in the driveway in front of said location and was parked near the location of the apparent blood that was found near the curb. Affiant noticed the vehicle was faced in such a manner that would allow the blood to be located nearest the passenger side of the vehicle. On same footage, Affiant noticed an individual exited said vehicle and left vehicle unattended for a short period of time. Affiant then noticed on the same footage, that an individual re entered [sic] the driver's door of said vehicle and it drove from the location.

- 16 -

Affiant received information from Jay Scifres, an employee of the North Texas Tollway Authority (NTTA), the Tolltag assigned to the Toyota RAV-4 indicated said vehicle had travelled northbound on the North Dallas Tollway on April 19, 2011 at approximately 0609 hours in the area of just north of W. Park Blvd. The tolltag indicated said vehicle exited the North Dallas Tollway at approximately 0616 hours near Lebanon Rd in Frisco, Texas. Approximately 17 minutes later at 0633 hours, the tolltag indicated said vehicle entered the North Dallas Tollway (southbound) near Lebanon Rd in Frisco, Texas. The tolltag then indicated the vehicle exited the North Dallas Tollway (southbound) near Parker Rd in Plano, Texas at approximately 0638 hours. On April 20, 2011, Affiant drove a route in which Affiant exited the North Dallas Tollway (northbound) at Lebanon Rd in Frisco, Texas and drove to Black's residence and then returned back to the North Dallas Tollway (southbound) and re-entered said roadway near Lebanon Rd in Frisco, Texas. This driving exercise took Affiant approximately 14 minutes to complete.

Affiant learned on April 20, 2011, at about 0029 hours, a Plano Police Officer had located said Toyota RAV-4 in an apartment complex located at 2525 Preston Rd, Plano, Texas. Affiant knows said location where vehicle was found is on Preston Rd between W Park Blvd and W Parker Rd. Affiant also knows the approximate walking distance from the location of found said vehicle to the Gleneagles Golf Teaching Center is 1 mile. Affiant was advised there is apparent blood evidence located on the inside and the outside of said vehicle.

Affiant has reason to believe and does believe that probable cause exists to show evidence related to the aggravated kidnapping investigation is located inside 9111 Rio Blanco, Frisco, Denton County, Texas.

*Evaluation of the Probable Cause Affidavit*

Appellant first argues that the affidavit fails to state probable cause to believe any evidence of a criminal offense would be found in his home. For example, Appellant asserts that the affidavit does not show that he had been at the house on the morning of the offense or that his neighbors had observed any unusual activity at the house. Additionally, he criticizes the affidavit because it does not include any evidence showing that he had been at Gleneagles on the morning of the offense, that he owned a gun capable of using the type of live rounds found at

Gleneagles, or that he had ever been violent toward the victim. As noted by the State in its brief, the Court of Criminal Appeals has rejected an approach which focuses on facts not included in the warrant affidavit: "The issue is not whether there are other facts that could have, or even should have, been included in the affidavit; we focus on the combined logical force of facts that are in the affidavit, not those that are omitted from the affidavit." *Rodriguez*, 232 S.W.3d at 62. Accordingly, we will focus our review on the facts actually stated in the affidavit and the reasonable inferences which can be drawn from those facts.

The probable cause affidavit set forth facts showing that Susan was attacked in the building where she worked at the Gleneagles Country Club at around 6 a.m. on April 19, 2011 and she was injured during the course of the initial attack. Security camera footage showed that a person pulled Susan's SUV up to the driveway by the building and it remained at that location for a short period of time before it was driven away. In addition to the blood found inside of the building where Susan worked, investigators found blood on the curb where the SUV was momentarily parked. The vehicle was driven northbound on the tollway to an area near Appellant's home, and after a seventeen-minute gap, the vehicle re-entered the tollroad and it was driven back to the area near Gleneagles and abandoned less than one hour after it was driven away from Gleneagles. Detective Epperson verified that a person could drive from the northbound Lebanon exit to Appellant's home and then return to the southbound Lebanon entrance to the tollroad in fourteen minutes. Susan's SUV was found shortly after midnight on April 20, 2011 with blood located on both the interior and exterior, and Susan was still missing when Detective Epperson applied for the search warrant. The affidavit showed that robbery was

- 18 -

not a motive for the offense because Susan's purse and her valuables were left behind and the perpetrator returned the vehicle to the area from which it had been taken less than one hour later.

The affidavit showed that Susan had a romantic relationship with Appellant in the past, but she had rejected Appellant's repeated efforts to renew that relationship. Recently, Appellant became angry when Susan refused to accept gifts he attempted to give her. Susan's ex-husband related to Detective Epperson that he had a physical altercation with Appellant when Appellant became extremely agitated and combative toward Susan. Susan's mother expressed concern about Appellant and she described him as "obsessed" with Susan. She also stated that Appellant was familiar with Susan's workplace and her work schedule.

Appellant does not challenge the portions of the affidavit regarding the evidence gathered at the crime scene, from the Tolltag records, or from Susan's SUV when it was recovered. He instead focuses on the statements made by Susan's family and friends about his relationship with Susan and he criticizes those statements as being nothing more than speculation and conjecture. When making the probable cause determination, the magistrate must evaluate the reliability of the affiant and his sources of information as part of the totality of the circumstances. *State v. Anderson*, 917 S.W.2d 92, 96 (Tex.App.--Houston [14th Dist.] 1996, pet. ref'd). A magistrate is entitled to rely on source information supplied by an average citizen, since, unlike many police informants, they are "much less likely to produce false or untrustworthy information." *Id., quoting Jaben v. United States*, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965). The magistrate could have inferred from the affidavit that Catherine Miller was knowledgeable about Susan's relationship with Appellant. Further, her characterization of Appellant as being

obsessive is not speculation because she related that Appellant continued to pursue Susan even though she rejected him repeatedly.

Appellant additionally argues that Epperson's statement in the affidavit regarding Appellant's familiarity with Susan's work location and schedule is a conclusion not supported by any evidence. The affidavit sets forth facts regarding Officer Scott's initial investigation at Gleneagles and his conversations with the Gleneagles general manager, Michael Wszolek, and two of Susan's Pilates students, Lisa Bacic and Laura Curran. Bacic and Curran were there to attend a Pilates class at 10 a.m. which was going to be taught by their "long time friend and instructor, Susan Loper." Epperson also interviewed Bacic and Curran who told him that they had known Susan for several years and it was uncharacteristic for her to miss a Pilates class. These facts support an inference that Susan had taught Pilates at Gleneagles for several years. The search warrant affidavit also reflects that Appellant and Susan had a romantic relationship in the past and it is reasonable to infer that he knew where she worked as well as her schedule.

The search warrant affidavit set forth facts which permitted the magistrate to conclude this was a planned rather than random crime and the motive for the abduction was something other than robbery. The magistrate could have reasonably found that Susan was abducted by someone who knew her and was familiar with her work schedule. Based on the statements of Susan's friends and families, Appellant became the immediate focus of the investigation and the evidence showed that the perpetrator drove Susan's SUV directly to the area where Appellant lived. Further, Detective Epperson confirmed that a person could drive from the tollway to Appellant's house and back to the tollway within the timeframe established by the Tolltag

- 20 -

records. We conclude that the magistrate had a substantial basis for finding there was a fair probability that evidence related to Susan's kidnapping would be found in Appellant's home. Issue One is overruled.

## THE SECOND SEARCH WARRANT

In Issue Two, Appellant contends that the trial court erred by denying his motion to suppress evidence seized under the second search warrant because the affidavit contained a deliberate or reckless falsehood.

### *Standard of Review and Applicable Law*

The United States Supreme Court held in *Franks v. Delaware* that if a defendant establishes by a preponderance of the evidence that the probable cause affidavit includes a false statement that was made knowingly, intentionally, or with reckless disregard for the truth, and the false statement is necessary to establish probable cause, the search warrant is invalid under the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *Thom v. State*, 437 S.W.3d 556, 563 (Tex.App.--Houston [14th Dist.]. 2014, no pet.). A misstatement in an affidavit that is the result of simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not invalidate the warrant. *Dancy v. State*, 728 S.W.2d 772, 783 (Tex.Crim.App. 1987), *citing Franks*, 438 U.S. at 170, 98 S.Ct. at 2674. An affidavit supporting a search warrant begins with the presumption of validity. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684; *Cates v. State*, 120 S.W.3d 352, 355 (Tex.Crim.App. 2003). Consequently, the defendant has the burden to rebut that presumption by proving by a preponderance of the evidence that the affiant made the false statement deliberately or with a

reckless disregard for the truth. *Franks*, 438 U.S. at 156, 171, 98 S.Ct. at 2676, 2684; *Davis v. State*, 144 S.W.3d 192, 201 (Tex.App.--Fort Worth 2004, pet. ref'd) (op. on reh'g). The defendant must also show that absent the false information, the remaining content is insufficient for probable cause. *Franks*, 438 U.S. at 156, 171-72, 98 S.Ct. at 2676, 2684-85; *Davis*, 144 S.W.3d at 201.

We explained in the discussion of Issue One that a highly deferential standard of review applies to a probable cause challenge to a search warrant because the trial court is restricted to the four corners of the document and no credibility determinations are made. *See McLain*, 337 S.W.3d at 271. A different standard applies when the defendant challenges the warrant affidavit on the ground that it contains known falsehoods as the trial court is not limited to the four corners of the affidavit. *Cates*, 120 S.W.3d at 355 n.3. If the defendant makes the requisite preliminary showing of deliberate falsity, the trial court must go behind the four corners of the affidavit. *Id.* The trial court at a suppression hearing, including one involving a *Franks* claim, is the sole trier of fact and the judge of the credibility of the witnesses and the weight to be given the evidence. *Hinojosa v. State*, 4 S.W.3d 240, 247 (Tex.Crim.App. 1999); *Janecka v. State*, 937 S.W.2d 456, 462 (Tex.Crim.App. 1996). Accordingly, we will utilize the bifurcated standard of review applicable to most suppression issues. *Jones v. State*, 338 S.W.3d 725, 739 (Tex.App.-- Houston [1st Dist.] 2011), *affirmed,* 364 S.W.3d 854 (Tex.Crim.App. 2012); *Davis v. State*, 144 S.W.3d 192, 201 (Tex.App.--Fort Worth 2004, pet. ref'd) (op. on reh'g). Under that standard, we give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor while

we review *de novo* application-of-law-to-fact questions that do not turn upon credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex.Crim.App. 2003). Because the trial court did not make explicit findings of fact, we must review the evidence in a light most favorable to the trial court's ruling. *See Torres v. State*, 182 S.W.3d 899, 902 (Tex.Crim.App. 2005); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex.Crim.App. 2002).

*No False Statement in the Affidavit*

On April 20, 2011, after the first search warrant was executed at Appellant's home, Detective Jeff Rich applied for a second search warrant of Appellant's home to seize computers, computer equipment and peripheral devices, data storage devices, stored communications, and printed or stored images of the victim. The affidavit set forth the same facts contained in Detective Epperson's affidavit and additionally stated the following:

> Detective Epperson and Detective Spillman executed a search warrant at 9111 Rio Blanco, Frisco, Denton, County, Texas. During this search, several letters and notes regarding the victim were located as well as printed information which appears to have been printed from a computer regarding the victim. Detective Epperson located a computer in the residence as well that was running and appeared to be connected to a printer. Affiant has reason to believe and does believe that probable cause exists to show evidence related to the Aggravated Kidnapping investigation is located inside 9111 Rio Blanco, Frisco, Denton County, Texas.

At the suppression hearing, Detective Elizabeth Spillman testified that she participated in the execution of the first search warrant at approximately 5:30 a.m. on April 20, 2011, and she seized some handwritten notes and printed documents from a desk drawer in Appellant's home. The handwritten notes specifically mentioned Susan's name. The handwritten note titled "Magic Formula" stated:

(1) I desire my lover (Susan) to love me and only me.  I want her to be faithful to me, love me unconditionally, and be loyal to me.

(2) I always receive whatever I ask for.

(3) I will not question or judge how it will come about.  If I make no judgement by myself, whatever I wish for will be granted.

(4) I will express my gratitude.

The printed documents pertain generally to dating relationships and do not mention Susan's name.  One document, which appears to have been printed or downloaded from the internet, is titled "Chapter 6: Easing Back Into Your Relationship" and it provides detailed advice for someone wishing to renew a relationship with an "Ex."

Detective Epperson explained in his testimony at the suppression hearing that even though the printed documents did not mention Susan by name, an inference could be drawn that they pertained to her.  Detective Rich testified that his affidavit is based on information he received from Detectives Epperson, Spillman, and Pfahning.  He further explained that the statements made in the last paragraph of his affidavit are based on information he received from the other detectives, and he understood that the handwritten notes mentioned Susan by name and the printed documents, which were about how to win someone back, were related to the victim.

Contrary to Appellant's reading of the affidavit, Detective Rich did not affirmatively state that the printed documents mentioned or referred to Susan by name.  His affidavit instead states that the printed documents are "regarding the victim."  There is evidence that the printed documents and handwritten notes are related because they were found together in the same drawer.  The printed documents provided instructions on how to renew a romantic relationship

with an "ex" and the handwritten notes address Appellant's desire to be romantically involved with Susan. A logical inference is that the printed documents pertain to Susan. Thus, the trial court could have reasonably found that challenged statement is not false. Even if the statement is construed as a misstatement or mischaracterization of the printed documents, there is no evidence that Detective Rich deliberately made a false statement or made it with reckless disregard for the truth. Accordingly, we overrule Issue Two.

## ALTERNATIVE PERPETRATOR DEFENSE

In his final issue, Appellant argues that the trial court violated his Sixth Amendment right to present a defense by excluding evidence that Jayson Hayes was an alternative perpetrator of the offense. More specifically, Appellant contends that the court abused its discretion by excluding evidence that Jayson Hayes had acted aggressively and violently with his ex-wives and others.

### *Standard of Review and Applicable Law*

The Sixth Amendment guarantees a defendant a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); *Miller v. State*, 36 S.W.3d 503, 506 (Tex.Crim.App. 2001). A defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule. *Miller*, 36 S.W.3d at 507. Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional right to present a meaningful defense. *Wiley v. State*, 74 S.W.3d 399, 405 (Tex.Crim.App. 2002); *Potier v. State*, 68 S.W.3d 657, 663 (Tex.Crim.App. 2002). A ruling excluding evidence may rise to the level of

a constitutional violation in two situations: (1) a state evidentiary rule which categorically and arbitrarily prohibits the defendant from offering otherwise relevant and reliable evidence which is vital to his defense; and (2) a trial court's clearly erroneous ruling excluding otherwise relevant and reliable evidence which forms such a vital portion of the case that its exclusion effectively precludes the defendant from presenting a defense. *Wiley*, 74 S.W.3d at 404; *Potier*, 68 S.W.3d at 665. Exclusions of evidence are unconstitutional only if they "significantly undermine fundamental elements of the accused's defense." *Potier*, 68 S.W.3d at 666, *quoting United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 1267-68, 140 L.Ed.2d 413 (1998). The exclusion of evidence is not prejudicial if the defendant was not prevented from presenting the substance of his defense to the jury. *Potier*, 68 S.W.3d at 666.

In *Wiley*, the Court of Criminal Appeals recognized that a defendant has a right to attempt to establish his innocence by showing that someone else committed the crime, but he "still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'" *Wiley*, 74 S.W.3d at 406. In order to be admissible, evidence must be relevant. TEX.R.EVID. 401, 402. Even relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. *See* TEX.R.EVID. 403.

As a general rule, we review a trial court's decision to admit or exclude evidence for an abuse of discretion and we will not reverse the ruling as long as it falls within the zone of reasonable disagreement. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex.Crim.App. 2006).

The abuse of discretion standard applies when the appellant asserts that the trial court violated his right to present a defense under the Sixth Amendment. *See Miller v. State*, 36 S.W.3d 503, 507 (Tex.Crim.App. 2001); *Delapaz v. State*, 228 S.W.3d 183, 201 (Tex.App.--Dallas 2007, pet. ref'd). Consequently, we will not reverse the trial court's decision to exclude defensive evidence unless the decision falls outside of the zone of reasonable disagreement. *Delapaz*, 228 S.W.3d at 201.

*The Excluded Defensive Evidence*

At the hearing held to determine the admissibility of the evidence regarding the alternative perpetrator defense, Appellant's counsel sought to introduce evidence that Jayson had committed bad acts against his ex-wives in order to show that he has a "propensity for violence and controlling the women in his life . . . ." Jayson's first wife, Tiffany Kana, testified that she and Jayson were married from March 1998 until December 1998. Jayson punched Tiffany in the face with his fist on two different occasions during the marriage, but she did not report the assaults to the police. She also characterized him as emotionally abusive and controlling. Tiffany admitted that Jayson did not ever contact her after the marriage ended in December 1998.

Suzanne McDonald and Jayson were married from March 2005 until August 2007, and they had one child together, S.H. In March of 2006, Suzanne and Jayson got into an argument during Spring Break and Jayson took Suzanne's car keys, cell phone, and the home cordless phone. Suzanne's oldest daughter from a prior relationship and S.H. were at home with them. When Suzanne confronted Jayson, he asked her what was she going to do, and was she going to

- 27 -

pick one child to take and leave the other one behind. Suzanne tried to get to the front door to scream for help, but Jayson grabbed both of her arms and held them. During this confrontation, Suzanne's mother, Ginger Curbello, called on Jayson's cell phone and he answered. When Suzanne heard her mother's voice, she began screaming. Curbello and Suzanne convinced Jayson to leave Suzanne and the child alone in the master bedroom that evening. The following day, Suzanne's arms were bruised. Suzanne did not call the police to report the incident. Jayson did not commit any other act of violence against Suzanne during the marriage, but he was controlling. He required Suzanne to be home from work at a specific time and he monitored the items she bought at the grocery store. Suzanne also testified that Jayson stalked her after the divorce. She admitted on cross-examination that they had been embroiled in a protracted custody fight over S.H. for six years. After Susan's death, Suzanne sent an email to Jayson stating that he could not exercise his scheduled Thursday night visitation with their daughter. Suzanne felt uncomfortable due to the media coverage of Susan's murder and she also thought Jayson needed time to grieve and "get his thoughts together emotionally." Jayson left a message for Suzanne stating that it was "no big deal" and he intended to exercise his scheduled visitation. When they spoke on the phone, Jayson became extremely angry to the point that Suzanne handed the phone to her husband, Richard. Jayson threatened to go over to the house and kill Richard.

Richard McDonald testified that Jayson had threatened him with violence at least four or five times. After Suzanne and Richard began dating, Jayson called Richard and told him to stay away from Suzanne and his daughter or he would "whip [Richard's] ass." This occurred approximately one year after Suzanne and Jayson divorced. In the fall of 2009, Jayson showed

up at S.H.'s dance class even though it was not a scheduled visitation night. He became belligerent with Suzanne and told her he would show up whenever he wanted. Richard stepped between them and Jayson threatened to "whip [Richard's] ass" in front of everyone, including numerous small children. Approximately one year later, Jayson again appeared at the recreation center and created a disturbance approaching Suzanne and attempting to intimidate her. Jayson was forced to leave and he waited for Richard outside. Jayson threatened to beat up Richard because he had gotten him kicked out of the dance class. Richard confirmed Suzanne's testimony about the conversation they had with Jayson the day after Susan's death. When Richard got on the phone with Jayson and told him they would not allow Jayson to have his visitation with S.H., Jayson became enraged and told Richard, "I will come and kill you." Despite all of these threats, Jayson never struck Richard with his fist. On cross-examination, Richard reluctantly admitted that he might have called Jayson in February 2012 after Suzanne filed for divorce and left a message apologizing to him.

Suzanne's mother, Ginger Curbello, contacted the Plano Police Department after Susan went missing and advised them of her concerns about Jayson. Curbello told the police that Jayson had been violent toward Suzanne. Curbello also testified that Jayson had a reputation for being violent towards women, but she admitted that she had no knowledge of his reputation and she based her opinion on what she had seen. Curbello provided two examples. In 2009, Jayson dropped off S.H. at Suzanne's house and would not let anyone hold S.H. Curbello told Jayson that this was not good for the child and Jayson replied, "Don't worry, this is only the beginning of the trouble." Curbello's second example was the confrontation between Suzanne and Jayson

when he hid the keys and telephones.

Appellant also sought to introduce the testimony of S.H.'s counselor, Ann Beal. Beal related that S.H. fears Jayson and suffers emotional distress when she visits him. S.H. told Beal that Jayson has repeatedly threatened to "get rid of" Richard and Suzanne and said that he would not let her go to their funerals.

The trial court concluded that this evidence did not connect Jayson to the charged offense, and further, the evidence would be excluded under Rule 403 due to the risk of jury confusion. The court granted the State's motion in limine and advised the parties to approach the bench if any evidence opened the door to the admission of this defensive evidence. While the trial court excluded the evidence pertaining to Jayson's prior bad acts, the court permitted Appellant to introduce other alternative perpetrator evidence as detailed in the factual summary. This included evidence that Jayson's fingerprints were found in the Pilates studio, his DNA was found in Susan's car, and he was Susan's boyfriend at the time of the offense. During trial on the merits, the court denied Appellant's request to cross-examine Jayson about his history of violence with his ex-wives. Likewise, the court refused to permit Appellant to cross-examine Detective Epperson about the violence Jayson directed at his ex-wives.

*No Nexus*

The question before us is whether the excluded alternative perpetrator evidence is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and Jayson. This court noted in *Workman v. State* that "it is unclear exactly how much evidence is necessary to sufficiently prove a nexus between the offense and

allegedly guilty third party," but evidence of third party guilt is inadmissible if it is mere speculation that another person may have committed the offense. *Workman v. State*, No. 08-07-00299-CR, 2010 WL 109704 at *5-7 (Tex.App.--El Paso Jan. 13, 2010, pet. ref'd)(not designated for publication). The excluded evidence showing that Jayson punched his first wife on two occasions and grabbed his second wife by the arms during an argument simply does not tend to connect him to the capital murder of Susan particularly when there is no evidence that he ever assaulted Susan or directed violence against her. Likewise, the evidence that Jayson was controlling in his relationship with his second wife does not tend to connect him to the charged offense because there is no evidence that the person who committed the offense had a controlling personality. Further, Jayson's emotionally hostile post-marriage relationship with his second wife and his threats to kill her current husband appear to be related exclusively to the ongoing child custody dispute. Given that Susan and Jayson did not have a child together, this evidence does not tend to make it more likely that Jayson killed Susan.

### Rule 403

Even if we assume for the sake of argument that the excluded evidence has some relevance, the trial court could have reasonably found that its probative value was minimal and substantially outweighed by the danger that the evidence would have confused the issues and misled the jury. *See* TEX.R.EVID. 403. In the absence of a nexus between the excluded evidence and the charged offense, this evidence would have drawn the jury's attention away from the charged offense to predominantly irrelevant matters and would have invited the jury to speculate that Jayson might have committed the offense. As the Court of Criminal Appeals observed in

- 31 -

*Wiley*, such invited speculation "intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice," rather than on hard evidence. *Wiley*, 74 S.W.3d at 407, *quoting United States v. McVeigh,* 153 F.3d 1166, 1191 (10th Cir. 1998). We conclude that the trial court did not abuse its discretion by excluding this evidence. Issue Three is overruled. Having overruled each issue presented, we affirm the judgment of the trial court.


September 23, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)